UNITED STATES v. DEBS et al.

UNION TRUST CO. v. ATCHISON. T. & S. F. R. CO.

(Circuit Court, N. D. Illinois. December 14, 1894.)

1. CONTEMPT—PROCEEDING IN EQUITY—CONCLUSIVENESS OF ANSWER.

In proceedings for contempt in equity, a sworn answer, however full and unequivocal, is not conclusive, even in the case of a stranger to the bill for the injunction which has been violated.

2. SAME—JUSTIFICATION—IRREGULARITIES.

Where a court had jurisdiction of an injunction suit, and did not exceed its powers therein, no irregularity or error in the procedure or in the order can justify disobedience of the writ.

**3. SAME.**

In a proceeding for contempt in disobeying an injunction, the sufficiency of the petition for the injunction, in respect to matters of form and averment merely, cannot be questioned.

**4. EQUITY JURISDICTION—RESTRAINING PUBLIC NUISANCE.**

Equity has jurisdiction to restrain public nuisances on bill or information filed by the proper officer, on behalf of the people.

**5. CONTEMPT—TRIAL BY COURT.**

Though the same act constitute a contempt and a crime, the contempt may be tried and punished by the court.

**6. COMBINATIONS IN RESTRAINT OF INTERSTATE COMMERCE — SCOPE OF THE STATUTE—CONSPIRACY.**

Act July 2, 1890 (26 Stat. 209), § 1, declaring illegal "every contract, combination in the form of trust, or otherwise, or conspiracy" in restraint of trade or commerce among the states, or with foreign nations, is not aimed at capital merely and combinations of a contractual nature, which by force of the title, "An act to protect trade and commerce against unlawful restraints and monopolies," are limited to such as the courts have declared unlawful, the words "in restraint of trade" having, in connection with the words "contract," and "combination," their common-law significance, but the term "conspiracy" is used in its well-settled legal meaning, so that any restraint of trade or commerce, if to be accomplished by conspiracy, is unlawful.

**7. SAME—CONSTRUCTION.**

The construction of the statute is not affected by the use of the phrase "in restraint of trade," rather than one of the phrases "to injure trade" or "to restrain trade."

**8. SAME—COMMERCE.**

The word "commerce," in the statute, is not synonymous with "trade," as used in the common-law phrase "restraint of trade," but has the meaning of the word in that clause of the constitution which grants to congress power to regulate interstate and foreign commerce.

**9. SAME—FORFEITURE OF PROPERTY.**

The provision of Act July 2, 1890, § 6, for forfeiture of "any property owned under any contract or by any combination, or pursuant to any conspiracy (and being the subject thereof) mentioned in this act, and being in the course of transportation from one state to another, or to a foreign country," does not imply that only cases in which property shall be found subject to forfeiture shall be deemed within the scope of the act.

**10. EQUITY JURISDICTION—RIGHT TO JURY.**

The power given by Act July 2, 1890, to circuit courts "to prevent and restrain violations" of the act, is not an invasion of the right of trial by jury, as the jurisdiction so given to equity will be deemed to be limited to such cases only as are of equitable cognizance.

**11. CONTEMPT—VIOLATION OF INJUNCTION—CONSPIRACY.**

Where defendants, directors, and general officers of the American Railway Union, in combination with members of the union, engaged in a conspiracy to boycott Pullman cars, in use on railroads, and for that purpose entered into a conspiracy to restrain and hinder interstate commerce in general, and, in furtherance of their design, those actively engaged in the strike used threats, violence, and other unlawful means of interference with the operations of the roads, and, instead of respecting an injunction commanding them to desist, persisted in their purpose, without essential change of conduct, they were guilty of contempt.

**12. SAME—INTERFERENCE WITH RECEIVER.**

Any improper interference with the management of a railroad in the hands of receivers is a contempt of the court's authority in making the order appointing the receivers, and enjoining interference with their control.

Proceedings for contempt against Eugene V. Debs and others for violation of injunctions issued, one on complaint of the United

States, and the other on petition of the receivers of the Atchison, Topeka & Santa Fé Railroad Company, appointed in a suit against that road by the Union Trust Company.

These informations were filed July 17, 1894. The substance of the first is:

That on the 2d day of July, 1894, the United States of America filed with the clerk of this court an information or complaint charging, among other things, that the defendants, Eugene V. Debs, George W. Howard, L. W. Rogers, Sylvester Keliher, the American Railway Union, and others, were engaged in a conspiracy unlawfully to interfere with and to prevent the transportation of the mails and interstate commerce over and upon the several railroads named in the complaint, and praying an injunction. That on that day, by order of the court, a writ of injunction was duly issued, whereby the defendants, and all persons combining and conspiring with them, and all persons whosoever, were commanded and enjoined "to desist and refrain"—

(1) From in any way or manner interfering with, hindering, obstructing, or stopping any of the business of any of the following named railroads: Atchison, Topeka & Santa Fé Railroad; Baltimore & Ohio Railroad; Chicago & Alton Railroad; Chicago & Eastern Illinois Railroad; Chicago & Erie Railroad; Chicago & Grand Trunk Railway; Chicago & Northwestern Railway; Chicago & Western Indiana Railroad; Chicago, Burlington & Quincy Railroad; Chicago Great Western Railway; Chicago, Milwaukee & St. Paul Railway; Chicago, Rock Island & Pacific Railway; Cleveland, Cincinnati, Chicago & St. Louis Railway; Illinois Central Railroad; Lake Shore & Michigan Southern Railway; Louisville, New Albany & Chicago Railway; Michigan Central Railroad; New York, Chicago & St. Louis Railroad; Pennsylvania Company; Wisconsin Central lines; Wabash Railroad; Union Stock-Yard & Transit Company,—as common carriers of passengers and freight between or among any states of the United States;

(2) "From in any way interfering with, hindering, obstructing, or stopping any mail trains, express trains, or other trains, whether freight or passenger, engaged in interstate commerce, or carrying passengers or freight between or among the states;

(3) From in any manner interfering with, hindering, or stopping any trains carrying the mail, and from in any manner interfering with, hindering, obstructing, or stopping any engines, cars, or rolling stock of any of said companies engaged in interstate commerce, or in connection with the carriage of passengers or freight between or among the states;

(4) From in any manner interfering with, injuring, or destroying any of the property of any of said railroads engaged in or for the purpose of, or in connection with, interstate commerce, or the carriage of the mails of the United States, or the transportation of passengers or freight between or among the states;

(5) From entering upon the grounds or premises of any of said railroads for the purpose of interfering with, hindering, obstructing, or stopping any of said mail trains, passenger or freight trains engaged in interstate commerce, or in the transportation of passengers or freight between or among the states, or for the purpose of interfering with, injuring, or destroying any of said property so engaged in or used in connection with interstate commerce, or the transportation of passengers or property between or among the states;

(6) From injuring or destroying any part of the tracks, roadbed, or road, or permanent structures of said railroads, and from injuring, destroying, or in any way interfering with any of the signals or switches of any of said railroads, and from displacing or extinguishing any of the signals of any of said railroads, and from spiking, locking, or in any manner fastening any of the switches of any of said railroads, and from uncoupling or in any way hampering or obstructing the control by any of said railroads of any of the cars, engines, or parts of trains of any of said railroads engaged in interstate commerce, or in the transportation of passengers or freight between or among the states, or engaged in carrying any of the mails of the United States;

(7) From compelling or inducing, or attempting to compel or induce, by threats, intimidation, persuasion, force, or violence, any of the employés of any of said railroads to refuse or fail to perform any of their duties as employés of any of said railroads in connection with the interstate business or commerce of said railroads, or the carriage of the United States mail by such railroads, or the transportation of passengers or property between or among the states;

(8) From compelling or inducing, or attempting to compel or induce, by threats, intimidation, force, or violence, any of the employés of any of said railroads who are employed by such railroad and engaged in its service in the conduct of interstate business, or in the operation of any of its trains carrying the mail of the United States, or doing interstate business, or the transportation of passengers and freight between and among the states, to leave the service of such railroads;

(9) From preventing any persons whatever, by threats, intimidation, force, or violence, from entering the service of any of said railroads, and doing the work thereof, in the carrying of the mails of the United States, or the transportation of passengers and freight between or among the states;

(10) From doing any act whatever in furtherance of any conspiracy or combination to restrain either of said railroad companies or receivers in the free and unhindered control and handling of interstate commerce over the lines of said railroads, and of transportation of persons and freight between and among the states; and

(11) From ordering, directing, aiding, assisting, or abetting, in any manner whatever, any person or persons to commit any or either of the acts aforesaid."

That the American Railway Union is a voluntary association, of which many thousand railway employés were at the time of the filing of the bill, and still are, members. That the defendant Eugene V. Debs is the president of the association; George W. Howard, its vice president; Sylvester Keliher, secretary and treasurer; L. W. Rogers, one of the directors; and all of the defendants were and are directors. That the avowed purpose of said union and its officers has been, and still is, to procure all of the employés of the railways within the United States to become members, and to concentrate the power and jurisdiction of the union and its members under one official control, with authority to order strikes, or a discontinuance of the service of such employés with any of the railway companies of the United States, at any time when the union, its board of directors or other officers, should elect so to do, wich or without sufficient cause. That on the 26th or 27th day of June, last past, prior to the filing of the bill and the issuing of the writ of injunction, the union, or its board of directors or other officers, including the defendants, had directed and ordered all its members engaged in the service of the Illinois Central Railroad Company in the transportation of the mails, and of interstate commerce, and all other trains controlled and operated by that company, to strike or quit service. That thereafter, and before the writ of injunction was issued, similar orders were issued to the employés of other railway companies, named in the bill of complaint; and that, in pursuance to those orders, all employés who were members of the American Railway Union did in a body leave the service of said railway companies, for the avowed purpose of hindering, preventing, and delaying the operation of trains engaged in the transportation of the mails and interstate commerce. That the order of injunction was published in the daily papers of Chicago on the morning of July 3, 1894. That each of the defendants had knowledge that the order had been duly entered in said cause. That a copy was served upon the defendant Rogers on the 3d day of July, and upon the defendant Eugene V. Debs early on the morning of July 4th, and upon the defendants George W. Howard and Sylvester Keliher on the 4th day of July, 1894. That the American Railway Union, prior to the 2d day of July, had organized many local unions upon substantially all the railroads in the northwest, from Chicago to California, including substantially all the railroads to the Pacific coast, and at the same time was engaged in organizing local unions upon the main lines of road extending from Chicago to the Atlantic coast; and that the work of organization and extension was

continued without change or interruption, after the service of the injunction, for the avowed purpose of conferring upon the union authority to order strikes upon all of the roads as rapidly as the local unions could be organized. That the orders for strikes and for the railway employés to leave in a body the service of the railroads named in the bill of complaint, as well as other railroads, were generally communicated by telegram from the defendant Debs to the officers or committees of local unions at the most important railway centers and cities. That copies of some of such telegrams and orders, so issued by the defendant Debs, both before and after the service of said writ of injunction, are herein inserted, for the purpose of showing that the service of the injunction did not affect or change the policy or conduct of the defendants relative to said strikes, but that, on the contrary, the defendants continued, notwithstanding the order of the court, and in direct and open violation thereof, to direct the employés of the railway companies named in the writ of injunction, as well as other railway companies, to leave the service of the companies in a body, and thereby hinder, delay, and prevent the discharge of their duty to the public, and especially the discharge of their duties as agents of the government in the transportation of the mails, as well as interstate commerce. That said telegrams, and hundreds of other telegrams, similar in form and character, were sent by the defendant Debs (with the knowledge, authority, and approval of each and all of the other defendants, as well as other directors of the American Railway Union), after the service upon them of the writ of injunction; and that, in pursuance of said orders and directions, many of the employés of the several railways named were induced to leave the service, and so-called "railway strikes" prevailed generally upon the lines of several of said railway companies, and the transportation of the mails and interstate commerce was thereby greatly hindered, delayed, and prevented, and upon some lines for several days.

That, as a direct result of the orders to strike upon some of the lines,— notably upon the Illinois Central Railroad, the Chicago, Rock Island & Pacific, the Chicago, Burlington & Quincy, the Chicago & Alton, the Chicago & Western Indiana, and upon the Pennsylvania Company's lines,— there was exercised upon the part of many of the strikers or ex-employés of the railway companies intimidation and open violence. That employés who refused to join in the strike, and others who had been employed by the railway companies to take the place of strikers, and were in the actual service of the companies, were assaulted and intimidated by the strikers, and driven from their post of duty, either by physical violence or threats of personal injury. That, during the 5th, 6th, and 7th days of July, the strikers, and others acting in sympathy with them, took forcible possession of some of the roads within and adjacent to the city of Chicago, and, by physical force, prevented the passage of trains carrying mails and interstate commerce. That engines and trains of cars were derailed, and passenger trains were assailed with stones and other missiles, as well as the employés in charge of such trains; and in some instances both the passenger cars and engines were fired upon, endangering the lives both of employés and passengers. That these mobs were in many instances led by the strikers or ex-employés of the railway companies, who had gone out of service upon the orders of the defendants as officers of the American Railway Union; and mobs composed of strikers and others were massed at different points, upon the different lines of road, within and adjacent to the city of Chicago, in such numbers as to be beyond the control of the government, state, and municipal authorities. That at least 1,000 freight cars belonging to the railway companies, some of which were loaded with interstate merchandise, were set on fire and destroyed. Signal towers and other appurtenances of the railways were burned. Employés of the railway companies who refused to obey the orders of the defendants and other officers of the American Railway Union, and remained faithful to the discharge of their duty, were violently assaulted, beaten, and bruised. and in some instances were forcibly arrested, and taken from their engines, and kept for hours in confinement. That many lives were also sacrificed,—all of which was a direct result of the numerous strikes ordered as aforesaid.

That the defendants had full knowledge that many of such violent acts upon the part of the strikers or ex-employés of the railroads had been perpetrated prior to the service of the injunction; and notwithstanding such knowledge, and the further knowledge that violence invariably follows all strikes of a similar character, they daily and continuously, and in willful violation after the service of the injunction, issued their orders and directions for the employés of the railways to quit service in a body, and also continued such orders while the mobs were in partial possession of the railroads, and engaged in forcible resistance of the orders of this court and its officers.

That the strikes were not ordered on account of any wrongful act of the railroad companies, or of their officers, towards the members of the American Railway Union or other employés of the railroad companies; but, on the contrary, the avowed purpose of the directors of the Railway Union, including the defendants, was wrongfully and unlawfully to establish a boycott against Pullman sleeping cars, which were used in great numbers by the railroad companies in trains carrying the mail and passengers traveling from state to state, and through the several states; and, to make boycott effectual, the directors of the American Railway Union, including the defendants, ordered that no trains or cars of any kind or character should pass over the tracks of any road within and adjacent to the city of Chicago until the use of Pullman cars had been abandoned by all of said railroad companies.

That the board of directors of the American Railway Union, including the defendants and its authorized agents, assume the authority and power, and, as complainant believes, have full authority and power, to order strikes and boycotts, and to discontinue the same, under the rules of the American Railway Union.

That such assumed power and authority is clearly shown by a communication signed by Debs, Howard, and Keliher, as officers of the union, and addressed to the railway managers, on the 12th of July, of which the following is a copy:

"Chicago, July 12, 1894.

"To the Railway Managers—Gentlemen: The existing troubles growing out of the Pullman strike having assumed continental proportions, and, there being no indication of relief from the wide-spread business demoralization and distress incident thereto, the railway employés, through the board of directors of the American Railway Union, respectfully make the following proposition as a basis of settlement:

"They agree to return to work in a body at once, provided they shall be restored to their former positions without prejudice, except in cases, if any there be, where they have been convicted of crime.

"This proposition, looking to an immediate settlement of the existing strike on all lines of railway, is inspired by a purpose to subserve the public good. The strike, small and comparatively unimportant in its inception, has extended in every direction, until now it involves or threatens not only every public interest, but the peace, security, and prosperity of our common country. The contest has waged fiercely. It has extended far beyond the limits of interests originally involved, and has laid hold of a vast number of industries and enterprises in no wise responsible for the differences and disagreements that led to the trouble. Factory, mill, mine, and shop have been silenced; widespread demoralization has sway. The interests of multiplied thousands of people are suffering. The common welfare is seriously menaced. The public peace and tranquillity are imperiled. Grave apprehensions for the future prevail.

"This being true,—and the statement will not be controverted,—we conceive it to be our duty as citizens, and as men, to make extraordinary efforts to end the existing strife and approaching calamities whose shadows are even now upon us. If ended now, the contest, however serious in some of its consequences, will not have been in vain. Sacrifices have been made, but they will have their compensations. Indeed, if lessons shall be taught by experience, the troubles now so widely deplored will prove a blessing of inestimable value in the years to come. The differences that led up to

the present complications need not now be discussed. At this supreme juncture, every consideration of duty and patriotism demands that a remedy for existing troubles be found and applied. The employés propose to do their part by meeting their employers halfway. Let it be stated that they do not impose any condition of settlement except that they be returned to their former positions. They do not ask the recognition of their organization or any organization.

"Believing this proposition be fair, reasonable, and just, it is respectfully submitted, with the belief that its acceptance will result in the prompt resumption of traffic, the revival of industry, and the restoration of peace and order.

"Respectfully,                           E. V. Debs, President,
                                         "G. W. Howard, Vice President,
                                         "Sylvester Keliher, Sec'y,
                                                  "American Railway Union.".

That the authority exercised over the members of the union by its board of directors, and by Debs, as its president, relative to the movement of trains, is shown by an order issued on the 2d day of July, 1894, of which the following is a copy:

"To the Panhandle Yard Men—Greeting: Please execute the orders of Mr. John Brenock in reference to the removal of dead stock from the stock yards to Globe station. This is issued by order of the board of directors, in the interest of public health.            Eugene V. Debs, President."

That the following report of an interview with the defendant Debs was published in the Chicago Herald of July 15th:

"We are in condition to keep the strike on for months. Nothing but armed intervention to-day permits the moving of trains. Throughout that great stretch of country which lies west of the Mississippi river our men are steadfast and willing to wait until the bitter end. You will notice that it is impossible to buy a ticket to the Pacific coast in Chicago to-day, except by way of the Great Northern Road, over which no Pullman cars are run, and against which we have no possible grievance. This shows the line on which our future campaign is to be carried. We shall keep the men of the West, where the air is purer and wholly free from plutocratic combinations, in line with our ideas. We shall persist in our work of organization throughout the East. As a road throughout the country hitherto unorganized by us falls into line, we shall call it out. And we shall keep on doing this until the very end of all things. If our present struggle, based, as it is, on motives wholly disinterested, be successful, there is no wage earner in the land who will not feel its beneficent effects before the year closes. And if this is true, when the command of the so-called 'arteries of commerce' falls into our hands, and the trades' unions which have given us comfort require reciprocation from us, we, and we alone, are in a position to give them material assistance. This is an axiom, and I believe no one will disagree with me."

### Answer of Debs, Howard, Rogers, and Keliher.

The defendants, being in custody under a writ of attachment issued by order of the court, Judge Seaman presiding, filed on the 23d of July a joint answer, admitting specified averments of the information, and in substance alleging:

That the purpose of the American Railway Union was the protection of all its members in their rights and interests as employés of the various railway systems of the United States, and to procure for them, by all lawful means, fair and adequate compensation for the service performed by them. That membership in the American Railway Union was open to every employé of good personal character and reputation, engaged upon the railway systems of the United States; and that to better secure and effectuate the objects of the union, as hereinbefore set forth, it was the desire and one of the purposes of the union to procure all such persons to become members. That, by the organization of the said American Railway Union, strikes could only be declared or discontinued by the vote of a majority of the members of such American Railway Union employed in the service affected by any

such strike; and that the only power, authority, or office of the officers or directors of the American Railway Union, or of these defendants, or either of them, in respect to said matter, was to notify the members of the union in the service concerned in such strike of the action taken by such majority. That, on or about the 26th or 27th day of June (contrary to the averments of the information), a majority of the members of the American Railway Union employed upon the Illinois Central Railroad and upon the other roads referred to in the information did for themselves, without any order, direction, or control of the American Railway Union, or of its officers or directors, or of these defendants, or any of them, voluntarily determine by vote that they would strike or leave the service of said railway companies; and that, in pursuance of that vote, the employés did, on or about the time stated, leave the service of the railway companies freely, and of their own accord, without any order, direction, or control on the part of said American Railway Union, its officers or directors, or of these defendants, or any of them. "Upon information and belief, the defendants deny that the employés so leaving the service of said railway companies, as aforesaid, did so for the purpose of hindering, preventing, and delaying said railway companies in the operation of trains engaged in the transportation of the United States mails and interstate commerce over the respective roads of said companies." They "deny that, after the service of said injunction, they or either of them carried on the work of organization other than by generally advising railroad employés to become members of such union, and receiving to membership persons so applying therefor as aforesaid. They expressly deny that the organization of said unions upon said roads, or any of them, was intended to confer or did confer upon said American Railway Union, its officers or directors, or upon these defendants, or either of them, the power and authority to order strikes upon said roads, as alleged in said information or otherwise, but, on the contrary, allege that strikes could be ordered upon said road by the employés of said road themselves, and that such employés were in no manner subject to the authority or control of said American Railway Union, its officers or directors, or of these defendants, or either of them, in that regard." "They deny that orders to strike were at any time or in any manner communicated by said American Railway Union, its officers or directors, or these defendants, or either of them, to said local unions, or any of them, as alleged in said information or otherwise."

"The defendants deny that any one of the telegrams set forth in said information was sent, or caused to be sent, by them, or any of them, or that they authorized or approved the same, or any one thereof, except a certain telegram dated July 6, 1894, in the words and figures following: 'We have assurance that within forty-eight hours every labor organization in this country will come to our rescue. * * * Whatever happens, do not give credence to rumors and newspaper reports,'— which said telegram defendants admit was sent, or caused to be sent, by the defendant Debs, as in said information alleged; but save as hereinbefore admitted, defendants allege that they had no knowledge or notice whatever of the sending of said telegrams, or of the contents thereof, until the filing of said information." "They deny that any other telegrams similar in form and character to those in said information set out were sent by the defendant Debs, or any of the defendants, with the knowledge, authority, or approval of any of said other defendants, at any time after the service of said writ of injunction upon said defendants, and deny that any employés of any of the railway companies named in said information were induced by reason of any telegram sent, or caused to be sent, by the defendants, or any of them, by threats, intimidation, force, or violence, to leave the service of said railway companies, or that the transportation of the United States mails and interstate commerce was thereby in any way hindered, delayed, or prevented." "The defendants admit that upon some of said lines of railway there was exercised, upon the part of some persons to the defendants unknown, violence against persons and property. They deny that they, or any of them, have any knowledge or information sufficient to form a belief as to the commission of the specific acts of violence in said information set forth, or any thereof; and, upon information and belief, they deny that any member of said American Rail-

vay Union in any manner participated in said acts of violence or any of them." "They deny that, in violation of the order of the court, they daily and continuously or at all issued any orders or directions for the employés of said railway companies, or any of them, to leave such service in a body, as alleged in said information or otherwise. They deny that at said time, or at any time, they knew that violence and unlawful conduct necessarily followed from strikes of the kind mentioned in said information, and deny that such is the fact, but, on the contrary, allege that, so far as said American Railway Union, or the members thereof, are concerned, said strike, and all strikes of a similar character, contemplate nothing more than the quiet, peaceable, and lawful cessation of work by such members when and for such periods as they shall for themselves determine. Defendants expressly deny that they, or any one of them, did at the time mentioned in said information, or at any other time, order, direct, counsel, advise, recommend, or approve the acts of violence in said information set forth, or any of them, or any violence or unlawful acts of any kind or character, but, on the contrary, allege that they did at all said times counsel and advise all members of the said American Railway Union with whom they were in communication to at all times abstain from violence, threats, intimidation, and to at al times respect the law and the officers thereof." "They deny that the board of directors of said American Railway Union, or its officers, or these defendants, or either of them, at any time assumed the authority and power, or have now or ever have had any authority or power whatsoever, to order strikes and boycotts, or to discontinue the same." "They admit that on the 12th day of July, 1894, the communication set out in said information was addressed to the railway managers, and signed by the defendants, whose names are affixed thereto, but allege that so much of said communication as implies or assumes any right, power, or authority in said defendants, or either of them, to discontinue said strike, was unauthorized, and that said defendants had no other power or authority in said matter than to recommend to the members of the said American Railway Union the adoption of the proposals therein stated." "Defendants admit the sending of the communication to the Panhandle yard men set forth in said information, but deny that in and by said communication they exercised, or assumed to exercise, any power or authority over said men, or any thereof, but that said communication was merely a request to said men to perform the acts therein stated." "They deny that they have any knowledge or information sufficient to form a belief as to whether the interview set forth in said information was in fact published in the Chicago Herald on July 15th, or at any other time. They deny that the defendant Debs, or any other defendants, caused said interview to be published, or uttered the statements therein contained, or any of them, but allege that said interview is wholly false, forged, and fictitious." "The defendants deny that they, or either of them, have in any way or manner interfered with, hindered, obstructed, or stopped any of the business of the railroads mentioned in said injunction, or either of them, as common carriers of passengers and freight between or among the states of the United States; or that they, or either of them, have in any manner interfered with, hindered, obstructed, or stopped any mail trains, express trains, or other trains, whether freight or passenger, engaged in interstate commerce, or carrying passengers or freight between or among the states; or that they, or either of them, have in any manner interfered with, hindered, or stopped any train carrying the mail; or that they, or either of them, have in any manner interfered with, hindered, obstructed, or stopped any engine, car, or rolling stock of any of said companies engaged in interstate commerce, or in connection with the carriage of passengers or freight between or among the states; or that they, or either of them, have in any manner interfered with, injured, or destroyed any of the property of any of said railroads engaged in or for the purpose of or in connection with interstate commerce, or the carriage of the mails of the United States, or the transportation of passengers or freight between or among the states; or that they, or either of them, have entered upon the grounds or premises of any of said railroads for the purpose of interfering with, hindering, obstructing, or stopping any of said mail trains, passenger, or freight trains,

engaged in interstate commerce, or in the transportation of passengers or freight between or among the states, or for the purpose of interfering with, injuring, or destroying any of said property so engaged in or used in connection with interstate commerce, or the transportation of passengers or property between or among the states; or that they, or either of them, have injured or destroyed any part of the tracks, roadbed, or road, or permanent structures of said railroads; or that they, or either of them, have injured, destroyed, or in any way interfered with any of the signals or switches of any of said railroads; or that they, or either of them, have displaced or extinguished any of the signals of any of the said railroads; or that they, or either of them, have spiked, locked, or in any manner fastened any of the switches of said railroads; or that they, or either of them, have uncoupled or in any way hampered or obstructed the control of any of said railroads or any of the cars, engines, or parts of trains of any of said railroads engaged in interstate commerce, or in the transportation of passengers or freight between or among the states, or engaged in carrying any of the mails of the United States; or that they, or either of them, have compelled or induced, or attempted to compel or induce, by threats, intimidation, persuasion, force, or violence, any of the employés of any of said railroads to refuse or fail to perform any of their duties as employés of any of said railroads in connection with the interstate business or commerce of such railroads, or the carriage of the United States mail by such railroads, or the transportation of passengers or property between or among the states; or that they, or either of them, have compelled or induced, or attempted to compel or induce, by threats, intimidation, force, or violence, any of the employés of said railroads who are employed by such railroads and engaged in its service in the conduct of interstate business, or in the operation of any of its trains carrying the mail of the United States or doing interstate business, or in the transportation of passengers and freight between or among the states, to leave the service of such railroads; or that they, or either of them, have prevented any person whatever, by threats, intimidation, force, or violence, from entering the service of any of said railroads, and doing the work thereof in the carrying of the mails of the United States, or the transportation of passengers and freight between or among the states; or that they, or either of them, have done any act whatever in furtherance of any conspiracy or combination to restrain either of the said railroad companies or receivers in the free and unhindered control and handling of interstate commerce over the lines of said railroad, and of transportation of persons and freight between and among the states; or that they, or either of them, ordered, directed, aided, assisted, or abetted in any manner whatever any person or persons to commit any or either of the acts aforesaid." "And the said defendants each for himself does plead to the said information that he is not guilty of any or either or all of the acts therein charged, or of any contempt of the orders of this court in the premises." "Defendants further allege that, after the service of said injunction upon them, they forthwith consulted competent counsel, learned in the law, and duly authorized and licensed to practice as attorney and counselor at law in the courts of the United States, and fully and fairly stated to him all the facts in the premises, and exhibited to him the order of the court made herein, and were advised by him as to what they might rightfully and lawfully do in the premises without violation of the order of the court or contempt of its authority; and that they have since that time in all things proceeded, in their acts and conduct in regard to said strike and the persons engaged therein, in strict accordance with the advice of the said attorney so by them consulted. And the said defendants each for himself denies that he intended in any way to violate the injunction of this court, or to act in defiance or contempt of its authority in any respect. And the defendants further allege that by the organization of said American Railway Union, and by custom and usage uniformly and universally prevailing therein, at all the times in said information mentioned, which said custom and usage had the force and effect of, and stood in lieu of, by-laws of said American Railway Union, and by the general and unanimous will, consent, delegation, and acquiescence of all the members thereof, the officers and directors of said American Railway

Union, including these defendants, were at all the times in said informa- tion mentioned fully authorized, empowered, and directed to act as the agents of the members of said American Railway Union, and all of them, and all the separate unions thereof, whenever a strike or cessation of labor had been determined upon by said members of said union, or either of them, to inform and advise them concerning the condition and prospects thereof, and the condition and attitude of the several local unions engaged therein, and to advise and counsel them as to peaceful and lawful methods pursued by them to secure the redress of grievances complained of by them, and to treat and negotiate for them, subject to their ultimate ratification, with their employers for a settlement or adjustment of the causes leading to said strike, but had no right, power, or authority to in any way order or com- mand any of said members in respect to any of said matters; and they al- lege that each and every act and thing done by them in reference to the strike in said information mentioned, or any of the persons engaged therein, was done in pursuance of such power and authority, and not otherwise. Wherefore, defendants pray that they may be adjudged not guilty of con- tempt; that the complainant's information be as to them dismissed, and they go hence without delay."

On July 25th the defendants filed a supplemental answer, denying "each and every allegation in said information contained, and each and every part thereof, save as the same are in their former answer expressly admitted or denied."

### Second Information.

On the 1st day of August, 1894, a second information was presented in the cause, directed against James Hogan, William E. Burns, R. M. Good- win, J. F. McVean, and M. J. Elliott. This information recites the filing of the original information, and the arrest of the defendants therein named upon the writ of attachment issued, and, alleging that the persons named were directors of the American Railway Union, reiterates the original aver- ments and charges further: That on or about June 27, 1894, the officers and directors of the American Railway Union entered into a combination and conspiracy to bring about, by their orders, their advice, their counsel and persuasion, the strike and boycott more particularly described in said original bill of complaint; and that the better to conduct the business of said combination and conspiracy, and to more effectually manage the vast number of persons being members of said American Railway Union and others engaged in such combination and conspiracy, said officers and board of directors divided up the work of such management and direction among committees. That, under said arrangement and action of the board of direct- ors, Debs and Howard would have, and thereafter they did have, charge of the work of publication and publicity; Rogers, Burns, and Goodwin had charge of all meetings and speakers, and the organization of lodges; and Hogan, either alone or with others of the directors, had charge of correspond- ence, and of the sending and receiving of letters and telegrams, or a con- siderable portion thereof. That each of the directors is responsible for every act done or omitted to be done by all or any of the other directors or officers or servants or agents in connection with the business of said strike or boycott. That, by arrangement or agreement of the board of directors, Rogers was to have charge of editing and the publishing of a certain newspaper called the "Railway Times," which was to be the official organ of the Ameri- can Railway Union. That the paper was published in the city of Chicago by Rogers; and that in and through said newspaper the directors counseled, encouraged, and directed the members of the American Railway Union and all other railway employés, including the employés of the railway companies named in the bill of complaint, to disregard said order and writ of injunction, and the orders and directions of the officers operating said railroads, respective- ly. That said officers and directors, in pursuance of said conspiracy, did, on different dates in the months of June and July, 1894, cause to be sent each and all of the telegrams set out in the original information, to which the name of said Debs is attached, and also the several following telegrams, which are set out by copy; also many hundred other telegrams of like pur- port, and with similar intent and purport, copies of which, sent to different

places in the different states, over the signature of E. V. Debs, between the dates of June 27 and July 29, 1894, are set out. That said defendants continued to send out, by telegraph, orders, directions, and advice to the meeting of the various unions along the lines of railroads, directing and counseling them to continue the strike and the various acts of interference with the operation of said roads; and that all of the directors have persisted in violation of the injunction, and in their defiance of the order of this court.

### Answer of Hogan and Others.

The defendants so brought into the case filed a joint answer, not essentially different from the answer of the original defendants, except that it contains the following averments:

They deny that on the 26th day of June, A. D. 1894, or at any other time, the American Railway Union, through its officers and directors, or otherwise, ordered or directed all or any of the employés of the railroad companies named in the bill, or either of them, to enter upon any strike for the purpose in the information alleged, or otherwise. They admit that at divers times during the month of June, and before the issuing of the injunction, they did counsel and advise certain of the employés of the railway companies named in the bill, all of the employés so counseled and advised being members of the American Railway Union, to quietly, peaceably, and lawfully quit the service of their employers, and allege that, in giving such advice and counsel, they acted for the employés, and by their authority conferred upon them or each of them, as hereinafter set forth. And they deny that their purpose in giving such advice and counsel was to cause any strike with the sole purpose, or with the purpose at all, of compelling the railway companies, or either of them, to unite with the American Railway Union, or with any person or persons, in any illegal boycott, or in any boycott whatsoever, and deny that the American Railway Union, its officers, directors, and members, or these defendants, or either of them, did on the day mentioned, or at any time, for any purpose or in fact, enter into any unlawful conspiracy or combination whatever to tie up or paralyze any of the business of any of said railroads or the carrying of the mails or interstate commerce until such company should consent to enter into any conspiracy or refuse to haul the cars of said Pullman Sleeping-Car Company, whether as alleged or otherwise, or that said combination was to be persisted in as alleged or otherwise. On the contrary thereof, the defendants allege that they were at all said times informed, and in good faith verily believed, that the railroad companies named in the bill, and all of them, had formed or organized and were members of a certain unlawful conspiracy and combination among and between themselves to reduce the wages and compensation of their employés upon said roads, and each of them, including the members of the American Railway Union thereon, and all of them; and that, pursuant to that conspiracy and combination, the railroad companies proposed and intended to make reduction in the wages of employés, including the members of the American Railway Union, upon each of the lines of railroad, separately and successively, they, the railroad companies, uniting their powers, property, and influence to prevent the employés, including the members of the American Railway Union, upon each of the lines whereon the wages were to be successively reduced, from obtaining redress against the action of the railroad companies in pursuance of such unlawful conspiracy, and proposed and intended, by their combined and united action, to overcome successively and in detail any lawful and peaceable resistance that the employés, or any of them, might make to the reduction of their compensation. And, upon information and belief, the defendants allege that such conspiracy was in fact formed at said time with the intents and for the purposes hereinbefore set forth.

"It is further alleged that at all times they were informed and did in good faith verily believe that the Pullman Palace-Car Company, a corporation organized under the laws of the state of Illinois, and engaged in the business of constructing passenger and other cars upon the lines of said railroads (which said Pullman Palace-Car Company had various contract relations with said railroad companies, and each of them, for the use of its

said cars), was a member of and party to said conspiracy, and all the intents and purposes thereof; and, upon information and belief, defendants allege that such was the fact in regard thereto." They allege that very many of the employés of the Pullman Palace-Car Company were members of the said American Railway Union at the time in the information mentioned, and for some months prior thereto had been such members. They deny that they, or either of them, knew, or could have known, that any such acts were certain or almost certain or probable or reasonably to be expected to follow from such strike or cessation of labor, or that the same were in any manner due to or occasioned by or resulted naturally or otherwise from the orders, directions, counsel, or advice or acts, or either thereof, of the officers and directors of said American Railway Union, or either of them, or these defendants.

They allege that obstructions of the business of the railroad companies, or either of them, by the so-called "strike," was occasioned solely by the free, voluntary, and peaceable action of the employés of said railway companies in quitting the service thereof, for the purpose of protecting themselves and their rights and interests, and for their own purposes, and to secure their own ends, without any orders, directions, control, counsel, or assistance from these defendants, or either of them. And they allege, on information and belief, that the railway companies, and each of them, in pursuance of said conspiracy, and for the purpose of maintaining the said Pullman Palace-Car Company in its dispute with its said employés, and for the purpose of overcoming the resistance of their employés to the acts threatened and contemplated by them, as aforesaid, and to bring down upon said employés the penalties of law, and endeavor to invoke against the employés the action of the courts of the United States, did, by their efforts, contribute largely to the hindering and impeding of said transportation of mails and interstate commerce; and that said railway companies could, had they been so disposed, have fully performed their duties, under the laws of the United States, in that regard. They allege that they and each of them have uniformly and consistently and at all times in said petition mentioned, by speech and writing, advised a great number of said American Railway Union members, and all persons acting with them, to use only peaceable and lawful methods, and to refrain from any force or violence or unlawful conduct whatever, and from any violation of the laws of the United States or any of the states thereof, or any order of the courts to them directed.

Defendants admit the proceedings in the nature of contempt had in this court against Eugene V. Debs, George W. Howard, Sylvester Keliher, and L. W. Rogers, and admit that in said information against such persons it was charged that they had caused to be sent certain telegrams, and that, in their answers, they deny the sending of all said telegrams except a certain one dated July 6, 1894. They deny that any or all of the telegrams set out in said information were sent, or caused to be sent, by the officers and directors of said American Railway Union except as hereinafter admitted, or that any other telegrams in relation to said strike were sent except as hereinafter admitted, and deny that any telegrams were sent by said officers and directors, or either of them, in pursuance of any combination or conspiracy, or to accomplish the purposes thereof. They deny that there was any specific division among the officers and directors of the American Railway Union of the business and duties of the organization or the labors occasioned by their relation to the cessation of labor or strike hereinbefore mentioned, but allege that, in respect to said work, each of said officers and directors performed generally the work and things coming under his notice, and seeming to him fit and proper to be done. They deny that said work was divided in the manner alleged in said information or otherwise, or any of said officers or directors had charge of the alleged divisions of work stated in said information, or any such divisions or departments of work. They allege that, in the actual practice of work, some tacit and occasional division actually occurred, but that the same was in nowise formally or generally observed; and that each and every one of said officers and directors acted for himself, upon his own judgment and respon-

sibility, except where, by conference upon a given subject, a course was determined upon; and that each one of said officers and directors was responsible solely for the specific acts by him done, and not otherwise. They allege that each and all the acts done by said officers and directors and by these defendants, and each of them, were so done in pursuance of the authority conferred upon them by the members of said American Railway Union as the same is hereinbefore alleged, and not otherwise. Defendants deny that, in pursuance of any arrangement or agreement or otherwise, the defendant Rogers was to have charge of the editing or publishing of the so-called "Railway Times"; or that said Rogers caused said paper to be published in the said city of Chicago, as alleged, or otherwise; or that, by said newspaper or otherwise, said directors, or either of them, have counseled, encouraged, directed, or advised the members of said American Railway Union, or any other person or persons, or class of persons, to disregard the order and writ of injunction of this court, or any order or writ of any court, or to disregard the orders and directions of the persons operating any railway at any time. They admit and allege that the telegrams set forth in said information were sent by the defendant James Hogan; and allege that the same were sent by him for the purpose and with the intent of peacefully and lawfully counseling and advising men who had, by reason of the grievances done or threatened to them, and by reason of the unlawful conspiracy of said railway companies and said Pullman Palace-Car Company, hereinbefore set forth, peaceably, lawfully, and voluntarily quit the service of said railway companies; and allege that said telegrams, and all of them, had no other relation to or effect upon said strike, or any of the matters incident to or growing out of the same, than might well result from the lawful and peaceful counsel to the members of the said American Railway Union as to such of their own personal rights and interests as were involved in said controversy. The said defendants each for himself denies that he intended in any way, in any act or thing by him done, to violate the injunction of this court, or to act in defiance or contempt of its authority. And the said defendants each for himself does plead to said information that he is not guilty of any of either or all of the acts therein charged, or of any contempt of the authority of this court in the premises.

The petition of the receivers shows their appointment in December, 1893; that, by the order appointing them, all persons were forbidden to interfere with their possession and management; that the road extends through a number of states, and is an important line of commerce, using Pullman sleepers under contract; that on the 22d of June, 1894, the defendants, being officers of the American Railway Union, entered into a conspiracy to boycott Pullman cars, and, upon the refusal of the receivers to submit to their dictation, proceeded to employ substantially the same modes of interference as are charged in the information presented in the other case in the name of the United States.

In addition to the order made when the receivers were appointed, it is also shown that on June 29, 1894, this court issued an additional order, for the protection of the receivers in the management of the property, whereby "all persons were enjoined and restrained from interfering in any manner with trains, cars, switches, or other property, and from interfering, by intimidation, threats, violence, or in any other manner, with the employés of said receivers in the performance of their duties"; that this order was published in the evening papers of Chicago on June 29th, and in morning papers of the 30th; and that on July 2d an injunction was issued, upon the petition of the United States, enjoining the defendants, and others in conspiracy with them, from interfering with the railroads named, including the Atchison, Topeka & Santa Fé; that, notwithstanding these orders and injunctions, the defendants persisted in "their illegal acts and doings, without change or abatement," etc.

The defendants Debs, Howard, Keliher, and Rogers, who only, in the first instance, were named in this information, filed an answer, differing in no respect which need be pointed out from their answer in the other case. The names of Hogan, Burns, Goodwin, McVean, and Elliott were afterwards

inserted in the information, by leave of court; and it was agreed that they should have the benefit of the answer already filed by Debs and others as if it were their own. The two cases were heard at the same time, upon an agreement that they should be considered to be separate hearings, but that any evidence introduced in either case might be considered in the other, if relevant.

Edwin Walker and T. E. Milchrist, U. S. Dist. Atty., for the United States.

E. A. Bancroft and John S. Miller, for receivers.

W. W. Erwin, Clarence S. Darrow, and S. S. Gregory, for defendants.

The attorneys for the receivers presented the following propositions and citations of authorities:

Any interference with property in the custody of the court is a contempt Richards v. People, 81 Ill. 551; Noe v. Gibson, 7 Paige, 513; In re Sowles, 41 Fed. 752. Such, also, is any act of interference by force or threats with employés in charge of such property. Secor v. Toledo, P. & W. R. Co., 7 Biss. 513, Fed. Cas. No. 12,605; King v. Ohio & M. R. Co., 7 Biss. 529, Fed. Cas. No. 7,800; In re Wabash R. Co., 24 Fed. 217; In re Higgins, 27 Fed. 443; In re Doolittle, 23 Fed. 544; U. S. v. Kane, Id. 748. See, also, In re Chiles, 22 Wall. 157; McCaulay v. Sewing Mach. Co., 9 Fed. 698; Sherry v. Perkins, 147 Mass. 219, 17 N. E. 307. Where the court has jurisdiction of the person, a disobedience of the court's order is contempt, though committed in another district. McCaulay v. Sewing Mach. Co., supra; Williams v. Hintermeister, 26 Fed. 889, 890. Aiding, advising, or persuading another to do a forbidden act, or even permitting another whose action can be controlled to do the forbidden act, is contempt. Societe Anonyme de la Distillerie de la Liqueur Benedictine de l'Abbaye de Fecamp v. Western Distilling Co., 42 Fed. 96; Blood v. Martin, 21 Ga. 127; Neale v. Osborne, 14 How. Pr. 81; Wheeler v. Gilsey, 35 How. Pr. 139; Stimpson v. Putnam, 41 Vt. 238; Poertner v. Russell, 33 Wis. 193.

WOODS, Circuit Judge, after making the foregoing statement: If the case presented were itself of less moment, the very great importance of some of the questions involved could not be overlooked. To the study of them I have devoted more time than could well be spared from other duties. It is due to counsel to say that the labor of the court, protracted and painstaking as it has been, has been greatly relieved by the contributions of learning and research which they brought to the discussion. While the principles considered are not new, in the question of the validity of the injunction which the defendants are charged with violating there are involved inquiries which in some respects go beyond the lines of established or unquestioned precedent.

A preliminary question in the case was whether or not, upon the filing of their answers, the defendants were entitled to be discharged without an inquiry into the facts. The authorities seem to be agreed, and accordingly the court ruled, District Judge Grosscup participating in the decision, that, in a proceeding for contempt in equity, a sworn answer, however full and unequivocal, is not conclusive. King v. The Vaughan, 2 Doug. 516; Underwood's Case, 2 Humph. 48, 49; Rutherford v. Metcalf, 5 Hayw. (Tenn.) 58, 61, 62; Magennis v. Parkhurst, 4 N. J. Eq. 433, 434; State v. Harper's Ferry Boat Co., 16 W. Va. 864, 873; Crook v. People, 16 Ill. 534, 537; Buck

v. Buck, 60 Ill. 105, 106; Welch v. People, 30 Ill. App. 399, 409; Yates' Case (Kent, Ch. J.) 4 Johns. 317, 373; McCredie v. Senior, 4 Paige, 378, 381, 382; Bank v. Schermerhorn, 9 Paige, 372, 375; U. S. v. Anon., 21 Fed. 761, 768.

The objection raised by demurrer that the injunction was illegal and void was overruled at the time of presentation, but with leave for further argument at the final hearing upon the evidence. A great body of evidence, consisting of the testimony of witnesses, telegrams, and other documents, has been adduced to show the guilt of the accused. The defendants, claiming the constitutional privilege against self-incrimination, refused to testify at the instance of the prosecution, and have offered no evidence in their own behalf, excepting parts of certain documents which were allowed to be read in connection with other parts offered by the prosecution. Besides denying that any violation of the injunction has been proved against them, the defendants now reassert and insist that the injunction is invalid, on the two grounds that the court had no jurisdiction to hear and determine the case in which the injunction was ordered, and that, though possessed of such jurisdiction, the court lacked organic power to make the particular order in question. Reference is made to Ex parte Fisk. 113 U. S. 713, 718, 719, 5 Sup. Ct. 724; In re Sawyer, 124 U. S. 200, 220–222, 8 Sup. Ct. 482; Ex parte Terry, 128 U. S. 289, 9 Sup. Ct. 77; Windsor v. McVeigh, 93 U. S. 274, 282, 283; Kerfoot v. People, 51 Ill. App. 409. If the injunction was, for any reason, totally invalid, no violation or disregard of it could constitute a punishable contempt; but if the court acquired jurisdiction, and did not exceed its powers in the particular case, no irregularity or error in the procedure or in the order itself could justify disobedience of the writ. Elliott v. Peirsol, 1 Pet. 340; Ex parte Watkins, 3 Pet. 193; In re Coy, 127 U. S. 731, 8 Sup. Ct. 1263. The considerations of public policy on which this rule rests are too plain and well understood to need restatement.

Was the case one of which the court had jurisdiction? No question is made, or could be made in a proceeding for contempt, of the sufficiency of the petition for the injunction in respect to matters of form and averment merely. In Coy's Case, supra, the court said:

"In all such cases, when the question of jurisdiction is raised, the point to be decided is whether the court has jurisdiction of that class of offenses. If the statute has invested the court which tried the prisoner with jurisdiction to punish a well-defined class of offenses,—as forgery of its bonds, or perjury in its courts,—its judgment as to what acts were necessary under these statutes to constitute the crime is not reviewable on a writ of habeas corpus."

The question here, therefore, is whether the case presented by the petition was of a class which in a federal court admits of the remedy by injunction.

Without going into the details of averment, the charge made against the defendants was that they were engaged in a conspiracy to hinder and interrupt interstate commerce and the carriage of the mails upon the railroads centering in Chicago, by means and in a manner to constitute, within the recognized definitions, a public nuisance. A nuisance is "anything that unlawfully work-

eth hurt, inconvenience, or damage." 3 Bl. Comm. 216. "A public nuisance is such an inconvenience or troublesome offense as annoys the whole community in general, and not merely some particular person." Id. 166. As defined in Wood on Nuisances (page 38), "a public nuisance is a violation of a public right, either by a direct encroachment upon public rights or property, or by doing some act which tends to a common injury, or by omitting to do some act which the common good requires, and which it is the duty of a person to do, and the omission to do which results injuriously to the public." A form of public nuisance of which cognizance has been taken by the courts of equity in England and in this country is called "purpresture," which is defined to be "an encroachment upon lands, or rights and easements incident thereto, belonging to the public, and to which the public have a right of access or of enjoyment, and encroachment upon navigable streams." "The remedy for a purpresture, simply, is by information in equity at the suit of the attorney general or other proper officer." Wood, Nuis. pp. 107, 117; People v. Vanderbilt, 28 N. Y. 396; New Orleans v. U. S., 10 Pet. 662; Attorney General v. Forbes, 2 Mylne & C. 123.

In Kerr on Injunctions (page 395) it is said:

"There is a wide difference between a purpresture and a nuisance. Although they may coexist, either may exist without the other. If the act complained of be a purpresture, it may be restrained at the suit of the attorney general, whether it be a nuisance or not. Being an encroachment on the soil of the sovereign, like trespass on the soil of an individual, it will support an action irrespective of any damage which may accrue. But, to constitute a public nuisance, damage to the public right of navigation or other public right must be shown to exist. If the act complained of be a mere purpresture, without being at the same time a nuisance, the court will usually direct an inquiry to be made whether it will be more beneficial to the crown to abate the purpresture or to suffer the erection to remain and be arrested; but, if the purpresture be also a public nuisance, this cannot be done, for the crown cannot sanction a public nuisance."

Accordingly, it is contended, and numerous decisions and texts are cited to show, that "equity had jurisdiction to restrain public nuisances upon bill or information filed by the attorney general on behalf of the people." High, Inj. §§ 745, 759, 764, 1570; Pom. Eq. Jur. § 1349; Wood, Nuis. p. 124; Story, Eq. Jur. §§ 921–924; 1 Daniell, Ch. Pr. 7, 8; Mitf. Eq. Pl. 104, 117, 196; Attorney General v. Johnson, 2 Wils. Ch. 87; Attorney General v. Forbes, 2 Mylne & C. 123; Attorney General v. Terry, 9 Ch. App. 423; Attorney General v. Birmingham, 4 Kay & J. 528; People v. Miner, 2 Lans. 396; People v. Ferry Co., 68 N. Y. 71; Davis v. Mayor, etc., 14 N. Y. 526; People v. Vanderbilt, 28 N. Y. 396; Id., 26 N. Y. 287; Attorney General v. Hunter, 1 Dev. Eq. 12. I quote passages, some of which, besides bearing upon the principal question of jurisdiction, will be found to be determinative of other questions which have come under discussion.

Story says:

Section 921: "In regard to public nuisances, the jurisdiction of courts of equity seems to be of a very ancient date. * * * The jurisdiction is applicable, not only to 'public nuisances,' strictly so called, but also to purprestures upon public rights and property. * * * In its common acceptation it [purpresture] is now understood to mean an encroachment upon the

king, either upon part of his demesne lands, or upon rights and easements held by the crown of the public, such as open highways, public rivers, forts, streets, etc., and other public accommodations." City of New Orleans v. U. S., 10 Pet. 662; Mohawk Bridge Co. v. Utica & S. R. Co., 6 Paige, 554; Attorney General v. Cohoes Bridge Co., 6 Paige, 133.

Section 923: "In cases of 'public nuisances,' properly so called, an indictment lies to abate them, and to punish the offenders; but an information also lies in equity to redress the grievance by way of injunction. The instances of the interposition of the court, however, are, it is said, rare, and principally confined to informations seeking preventive relief. Thus, informations in equity have been maintained against a public nuisance by stopping a highway."

Section 924: "The ground of this jurisdiction of courts of equity in cases of purpresture, as well as of public nuisances, undoubtedly is their ability to give a more complete and perfect remedy than is attainable at law, in order to prevent irreparable mischief, and also to suppress oppressive and vexatious litigations. In the first place, they can interpose, where the courts of law cannot, to restrain and prevent such nuisances which are threatened or are in progress, as well as to abate those already existing. In the next place, by a perpetual injunction, the remedy is made complete through all future time."

### So Pomeroy, in section 1349, says:

"A court of equity has jurisdiction to restrain existing or threatened public nuisances by injunction, at the suit of the attorney general, in England, and at the suit of the state, or the people, or municipality, or some proper officer representing the commonwealth, in this country." Attorney General v. Eau Claire, 37 Wis. 400; State v. Eau Claire, 40 Wis. 533; Rochester v. Erickson, 46 Barb. 92; Pennsylvania v. Wheeling, etc., Bridge Co., 13 How. 518.

### Wood (volume 1, p. 124) says:

"While, at the close of the Revolution, the people of each state, in their sovereign capacity, acquired the absolute right to all navigable waters and the soil under them, yet where the state has permitted a use of navigable waters connecting the two states that interferes with navigation, the general government, under the power given it by the constitution to regulate commerce between the states, may exercise jurisdiction over the waters, and procure an abatement of such obstructions." Insurance Co. v. Curtenius, 6 McLean, 209, Fed. Cas. No. 3,045.

### High says:

Section 1554: "When the right involved is purely of a public nature, and the grievance which it is sought to enjoin is one which affects the public at large, the proceeding is usually instituted, both in England and in this country, by the attorney general in behalf of the people, sometimes proceeding in his own name or that of the people absolutely, and sometimes upon the relation of a citizen; and in actions to enjoin the erection or continuance of public nuisances this course is generally pursued." State v. Dayton & S. E. R. Co., 36 Ohio St. 434; People v. Vanderbilt, 28 N. Y. 396.

Section 764: "When proceedings are had to enjoin a public nuisance, such as the pollution of a river by a board of municipal officers in violation of an act of parliament under which they are acting, a distinction is drawn, as to the necessity of proving an actual injury, between the case of an information filed by the attorney general in behalf of the public and a bill filed by private citizens in their own behalf; and in the former case it is held to be unnecessary for the attorney general to establish any actual injury, the statute having prohibited the act complained of."

Section 745: "It is, however, to be observed that the fact that the commission of the threatened act, which it is sought to enjoin as a nuisance, may be punished criminally as such, will not prevent the exercise of the restraining power of equity." People v. St. Louis, 5 Gilman, 351; Attorney General v. Hunter, 1 Dev. Eq. 12; Gilbert v. Canal, etc., Co., 8 N. J. Eq. 495.

To the same effect, in 2 Daniell, Ch. Pl. & Pr. (4th Ed.) p. 1636, it is said: "In cases of 'public nuisance,' properly so called, an indictment lies to abate them, and to prosecute the offender; but an information will also lie in equity to stop the mischief, and to restrain the continuance of it"; and among the cases cited in support of the text are Attorney General v. Nichol, 16 Ves. 338; Attorney General v. Forbes, 2 Mylne & C. 123; Attorney General v. Cambridge Consumers' Gas Co., L. R. 6 Eq. 282; Bunnell's Appeal, 69 Pa. St. 59. See, also, Craig v. People, 47 Ill. 487; Attorney General v. Railroad Companies, 35 Wis. 527; Attorney General v. City of Eau Claire, 37 Wis. 400.

The supreme court of the United States has spoken on the subject. In the case of Mayor of Georgetown v. Alexandria Canal Co., 12 Pet. 91, 98, where an injunction was sought against obstructing the navigation of the Potomac river, the court said:

"Besides this remedy at law, it is now settled that a court of equity may take jurisdiction, in cases of public nuisance, by an information filed by the attorney general. This jurisdiction seems to have been acted on with caution and hesitancy. Thus, it is said by the chancellor, in 18 Ves. 217, that the instances of the interposition of the court were confined and rare. He referred, as to the principal authority on the subject, to what had been done in the court of exchequer upon the discussion of the right of the attorney general, by some species of information, to seek, on the equitable side of the court, relief as to nuisance, and preventive relief. Chancellor Kent, in Attorney General v. Utica Ins. Co., 2 Johns. Ch. 382, remarks that the equity jurisdiction in cases of public nuisance, in the only cases in which it had been exercised (that is, in cases of encroachment on the king's soil), had lain dormant for a century and a half (that is, from Charles I. down to the year 1795). Yet the jurisdiction has been finally sustained upon the principle that equity can give more adequate and complete relief than can be obtained at law. While, therefore, it is admitted by all that it is confessedly one of delicacy, and accordingly the instances where it is exercised are rare, yet it may be exercised in those cases in which there is eminent danger of irreparable mischief before the tardiness of the law can reach it."

See, also, the opinion in Pennsylvania v. Wheeling, etc., Bridge Co., 13 How. 518, where a bridge across the Ohio river was held to be a public nuisance, and ordered abated, at the suit of the state of Pennsylvania.

But while this jurisdiction of the English courts of chancery and of the equity courts of the several states of the Union is not understood to be disputed by counsel for the defendants, they do insist that, in the absence of legislation by congress conferring the authority, the federal courts can do nothing for the protection of the highways of interstate commerce, whether upon land or water. They cite the following language from the opinion in Parkersburg & O. R. Transp. Co. v. City of Parkersburg, 107 U. S. 691, 2 Sup. Ct. 732, in which Pennsylvania v. Wheeling, etc., Bridge Co., it may be observed, is declared to be "a peculiar case":

"Now, wharves, levees, and landing places are essential to commerce by water, no less than a navigable channel and a clear river. But they are attached to the land; they are private property,—real estate; and they are, primarily at least, subject to the local state laws. Congress has never yet interfered to supervise their administration; it has hitherto left this exclusively to the states. There is little doubt, however, that congress, if it

saw fit, in cases of prevailing abuses in the management of wharf property,—abuses materially interfering with the prosecution of commerce,—might interpose and make regulations to prevent such abuses. When it shall have done so it will be time enough for the courts to carry its regulations into effect by judicial proceedings properly instituted; but, until congress has acted, the courts of the United States cannot assume control over the subject as a matter of federal cognizance. It is congress, and not the judicial department, to which the constitution has given the power to regulate commerce with foreign nations and among the several states. The courts can never take the initiative on this subject."

And from Bridge Co. v. Hatch, 125 U. S. 1, 8 Sup. Ct. 811, the following:

"The power of congress to pass laws for the regulation of the navigation of public rivers, and to prevent any and all obstructions therein, is not questioned; but, until it does pass some such law, there is no common law of the United States which prohibits obstruction and nuisances in navigable rivers, unless it be the maritime law, administered by the courts of admiralty and maritime jurisdiction. No precedent, however, exists for the enforcement of any such law; and, if such law could be enforced (a point which we do not undertake to decide), it would not avail to sustain the bill in equity filed in the original case. There must be a direct statute of the United States in order to bring within the scope of its laws, as administered by the courts of law and equity, obstructions and nuisances in navigable streams within the states. Such obstructions and nuisances are offenses against the laws of the states within which the navigable waters lie, and may be indicted or prohibited as such; but they are not offenses against United States laws which do not exist, and none such exist except what are to be found on the statute book."

Accordingly, notwithstanding the provision, in the "Act for the admission of Oregon into the Union" that "all the navigable waters of said state shall be common highways and forever free," it was held in that case that the bridge which it was sought to remove was not an offense against the United States, in the absence of direct legislation bringing obstructions and nuisances in navigable streams within the scope of national law.

In reply to this position of the defense, reference is made to the "Act to regulate commerce," as amended by the act of March 2, 1889 (25 Stat. 855); and it is contended that by force of the provisions of that statute, passed in exercise of the power conferred on congress by the constitution "to regulate commerce among the several states," the national control has been extended over the channels and agencies of interstate commerce, including railways as well as navigable waters, and that out of this legislation, whatever had been the rule before, has arisen by necessary implication the jurisdiction of the federal courts, in accordance with the principles of equity, to protect that commerce against interference or obstruction. The right of the federal government to obtain the injunction is also asserted upon the ground of property right in the mails.

That the nation owns the mail bags is of course beyond dispute, and that it pays large sums annually for the carrying of the mails upon the railroads is well understood. In Searight v. Stokes, 3 How. 151, where the question was whether vehicles carrying the mails were "laden with the property of the United States," and therefore exempt from toll on the Cumberland road, in Pennsylvania, the supreme court said:

"The United States have unquestionably a property in the mails. They are not mere common carriers, but a government, performing a high official duty in holding and guarding its own property as well as that of its citizens committed to its care; for a very large portion of the letters and packages conveyed on this road, especially during the sessions of congress, consists of communications to or from the officers of the executive department, or members of the legislature, on public service or in relation to matters of public concern."

It is said, on the contrary, to be easy "to show that, at common law, jurisdiction of the chancery on information of the attorney general to restrain a purpresture or nuisance rests on the idea that the king owns the land whereon it exists." It is doubtless true that, in the cases where the jurisdiction was invoked, the king was the owner of the land, because the land under navigable waters in England has always belonged to the crown; but the object of the suits has always been, not to vindicate the title to the land, which could have been done by the action of ejectment, but to prevent or remove obstructions to navigation, which required the prompt and efficient methods of equity; and it is not to be believed that if in England, as along the fresh-water rivers of this country, the title of lands under the water had belonged to the riparian owners, the same jurisdiction would not have been exercised for the protection of the public right of navigation. The public interest is concerned in the unobstructed use of the water, and it is sticking in the mud to say that the right to protect that use is dependent upon the ownership of the underlying soil. If, however, the jurisdiction in such cases must be held to rest upon some legal title or property right, which by fiction shall be deemed to be worthy of equitable protection, or to afford a basis of jurisdiction for protecting incidental rights, it would seem that the property which the government has been declared to have in the mails and its unquestioned ownership of mail bags might well be deemed sufficient for the purpose. Justice Brewer said in U. S. v. W. U. Tel. Co., 50 Fed. 28, 42: "The dollar is not always the test of real interest. It may properly be sacrificed if anything of higher value be thereby attained."

"But," say counsel, "this whole subject is utterly foreign to the question in this case. * * * Waterways are not railways. They are free to all comers, and are not the subject of private ownership nor control, but only of municipal regulation by public authority. Lake Front Case, 146 U. S. 387, 13 Sup. Ct. 110. The control of the railway is primarily with the company that owns and operates it. These great interests are entirely able to cope with any interference with their property. If they be held, in a high sense, as trustees for the public, why should equity entertain a suit by the beneficiaries of this trust until the trustees have proved recreant? These companies own the land over which their lines run, or a right of way in perpetuity, and, though charged with public duties, are still private pecuniary corporations operated for gain. As to all local matters, viz. the speed of trains, stopping at crossings, elevation of tracks, and things of that character, they are subject to local or state regulation. This could not be were the power of congress exclusive as in the matter of interstate rates. Wabash, etc., Ry.

Co. v. People of Illinois, 118 U. S. 557, 7 Sup. Ct. 4." It is, of course, true that waterways are not railways; that the latter and the title to the land under them are owned and controlled, under legal limitations, by companies which operate them for gain; but so are the boats which ply the rivers and lakes of the country; and I see no reason in any of the suggestions advanced for saying that the courts may give to commerce on the rivers a protection which they may not extend to commerce on the railways. The railroad companies are clothed with the power of eminent domain, to enable them to acquire lands necessary for their purposes, because the proposed use is for the public benefit. To the extent of the share which the companies have in interstate commerce they hold their lands and rights of way for the benefit of the general public and subject to the national control. "For this purpose," to use the expression of the supreme court in Gilman v. Philadelphia, 3 Wall. 713, in respect of navigable waters, "they are the public property of the nation, and subject to all the requisite legislation of congress."

But while the reasons to justify, on the grounds considered, the issuing of the injunction for the purpose of protecting, against obstruction or interruption, either the mails alone or interstate commerce, of which the carrying of the mails is a part, are strong, and perhaps ought to be accepted as convincing, there seems to be no precedent for so holding, and the responsibility of making a precedent need not now be assumed.

While, however, the point is not decided, the authorities on the subject have been brought forward so fully because, in part, of their bearing upon the question now to be considered,—whether or not the injunction was authorized by the act of July 2, 1890. It was under that act that the order was asked and was granted; but it has been seriously questioned in this proceeding, as well as by an eminent judge and by lawyers elsewhere, whether the statute is by its terms applicable, or consistently with constitutional guaranties can be applied, to cases like this. It is admitted in one of the briefs for the defendants, and the authorities already quoted clearly demonstrate, "that were congress to declare that the United States might maintain a bill to enjoin the obstruction of interstate commerce on railroads engaged therein, where such obstructions amounted to what, on a public highway, would be a public nuisance, such legislation would be admissible." Such an act, not going beyond the scope of equity jurisdiction in England at the time when the federal constitution was adopted, it is plain would not be obnoxious to the objection that it was an invasion of the field of criminal law which involved interference with the right of trial by jury. The jurisdiction of the courts of equity, and by implication their right to punish for contempt, are established by the constitution, equally with the right of trial by jury; and so long as there is no attempt to extend jurisdiction over subjects not properly cognizable in equity, there can be no ground for the assertion that the right of jury trial has been taken away or impaired. The same act may constitute a contempt and a crime. But the contempt is one thing, the crime another; and the punishment for one is not a dupli-

cation of the punishment of the other. The contempt can be tried and punished only by the court, while the charge of crime can be tried only by a jury.

The first and fourth sections of the act of July 2, 1890 (26 Stat. 209), read as follows:

Section 1: "Every contract, combination in the form of trust, or otherwise, or conspiracy, in restraint of trade or commerce. among the several states, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

Section 4: "The several circuit courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this act; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the attorney general, to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the cause and praying that such violation shall be enjoined or otherwise prohibited. When the parties complained of shall have been duly notified of such petition the court shall proceed, as soon as may be, to the hearing and determination of the case; and pending such petition and before final decree, the court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises."

It is not contended that other sections bear materially upon the construction or interpretation of these, except the sixth, to which reference will be made further along. The position of the defendants in respect to this statute, as stated in one of the briefs, is that it "is directed at capital," "at dangers very generally supposed to result from vast aggregations of capital;" that "the evil aimed at is one of a contractual character, and not of force and violence." In another brief it is said more definitely:

"That, sections 1 and 6 being construed together, it is apparent that the statute is aimed at monopoly of trade or commerce by which trade should be engrossed, and in and by which property should be employed and secured, but that, even should this contention be denied, still the statute does not confer a right on the government to proceed under the direction of the attorney general to abate a public nuisance existing in a highway of interstate commerce, but generally, by section 4, to prevent and restrain, by injunction, violations of a penal statute. It is thought, therefore, that, as held by Judge Putnam in U. S. v. Patterson, 55 Fed. 605, this act is inapplicable; but, if it is, then it is unconstitutional as an attempt to enforce a penal statute in equity, and not a justifiable authority for a proceeding familiar to equity, and, under congressional authority, admissible in the federal courts in the name of the government."

The very elaborate arguments presented in support of these propositions are the same, in the main, as were made and reported at length in the case referred to (U. S. v. Patterson), and therefore need not be restated. Reference was made in that case, and has been made in this, to the debates in congress while the measure was under consideration in that body; and, though it is conceded that we cannot take the views or purposes expressed in debate as supplying the construction of statutes, it is said we may gather from the debates in congress, as from any other source, "the history of the evil which the legislation was intended to remedy." Doubtless, that is often

true; and in this instance it is perhaps apparent that the original measure, as proposed in the senate, "was directed wholly against trusts, and not at organizations of labor in any form." But it also appears that before the bill left the senate its title had been changed, and material additions made to the text; and it is worthy of note that a proviso to the effect that the act should not be construed to apply "to any arrangements, agreements or combinations made between laborers with a view of lessening hours of labor or of increasing their wages, nor to any arrangements, agreements or combinations among persons engaged in horticulture or agriculture made with the view of enhancing the price of agricultural or horticultural products," was not adopted. Such an amendment, doubtless, was not necessary in order to exclude agreements and arrangements of the kind mentioned; but the offering of the proposition shows that the possible application of the statute to cases not in the nature of trusts or monopolies, and in which workmen or farmers should be concerned, was not overlooked. But it is more significant that, upon the introduction of the bill into the house, the chairman of the judiciary committee, as reported in the Congressional Record (volume 21, pt. 5, p. 4089), made the following statement:

"Now, just what contracts, what combinations in the form of trusts, or what conspiracies will be in restraint of trade or commerce, mentioned in the bill, will not be known until the courts have construed and interpreted this provision."

It is therefore the privilege and duty of the court, uncontrolled by considerations drawn from other sources, to find the meaning of the statute in the terms of its provisions, interpreted by the settled rules of construction. That the original design to suppress trusts and monopolies created by contract or combination in the form of trust, which of course would be of a "contractual character," was adhered to, is clear; but it is equally clear that a further and more comprehensive purpose came to be entertained, and was embodied in the final form of the enactment. Combinations are condemned, not only when they take the form of trusts, but in whatever form found, if they be in restraint of trade. That is the effect of the words "or otherwise." It may be that those words should be deemed to include only forms of like character,—that is to say, some form of contract as distinguished from tort; but, if that be so, it only emphasizes and makes imperative the inference, which otherwise it seems to me would be sufficiently clear, that the word "conspiracy" should be interpreted independently of the preceding words. It is hardly to be believed that the words "or otherwise" were used simply for the purpose of giving fuller scope to the antecedent words "contract" and "combination," and then "conspiracy" added merely for the same purpose. Construed literally, the terms used in the body of this act forbid all contracts or combinations in restraint of trade or commerce; but that construction is controlled by the title, which shows that only unlawful restraints were intended. But what constitutes an unlawful restraint is not defined; and, under the familiar rule that such federal enactments will be interpreted by the light of the common law, I have no doubt but that this

statute, in so far as it is directed against contracts or combinations in the form of trusts, or in any form of a "contractual character," should be limited to contracts and combinations such, in their general characteristics, as the courts have declared unlawful. But to put any such limitation upon the word "conspiracy" is neither necessary, nor, as I think, permissible. To do so would deprive the word, as here used, of all significance. It is a word whose meaning is quite as well established in the law as the meaning of the phrase "in restraint of trade," when used—as commonly, if not universally, that phrase has been used—in reference to contracts. A conspiracy, to be sure, consists in an agreement to do something; but in the sense of the law, and therefore in the sense of this statute, it must be an agreement between two or more to do, by concerted action, something criminal or unlawful, or, it may be, to do something lawful by criminal or unlawful means. A conspiracy, therefore, is in itself unlawful, and, in so far as this statute is directed against conspiracies in restraint of trade among the several states, it is not necessary to look for the illegality of the offense in the kind of restraint proposed; and, since it would be unnecessary, it would be illogical, to conclude that only conspiracies which are founded upon, or are intended to be accomplished by means of, contracts or combinations in restraint of trade, are within the purview of the act. It would be to make tautologous words which have distinctly different meanings, and to deprive the statute, in a large measure, of its just and needful scope. Any proposed restraint of trade, though it be in itself innocent, if it is to be accomplished by conspiracy, is unlawful. A distinction has been suggested between the phrase "in restraint of trade" and the phrases "to injure trade" and "to restrain trade." Though perceptible, the distinction does not seem to me so significant that the use of one expression rather than the other should vary the interpretation of this statute. Any contract, combination, or conspiracy, to be "in restraint of trade," must involve the use of means of which the effect is "to injure" or "to restrain" trade. A contract, combination, or conspiracy in restraint of trade is therefore a contract, combination, or conspiracy to restrain or to injure trade. It would not, I suppose, be enough, in an indictment, to charge conspiracy in restraint of trade in the language of the statute, but it would be necessary, unless the proposed restraint be shown to be in itself unlawful, to allege the illegal means intended to be used in order to effect the restraint; and whether the means should be averred to have been used "in restraint of" or "to restrain" trade could hardly be important. There are many cases, doubtless, in which the rule that every word of a statute should be given effect is inapplicable, because, when synonymous words are used, the court is powerless to give them different meanings; but, when words of different significance are employed, the rule forbids that the scope of the statute be compressed within the limits of the narrower word. "Drinking house" and "tippling house" are necessarily one, and it was well held in Reg. v. McCulley, 2 Moody, Cr. Cas. 34, that "ram, ewe, sheep, and lamb" were all covered by the word "sheep"; but, if the words had been "ram, ewe, or sheep," it would have been a plain violation of the rule to reject

the comprehensive word "sheep," and say that lambs or wethers were not included. Rice v. Railroad Co., 1 Black, 379; Gelpcke v. City of Dubuque, 1 Wall. 220; Fau v. Marsteller, 2 Cranch, 10; Adams v. Woods, Id. 337; U. S. v. Coombs, 12 Pet. 72; Maillard v. Lawrence, 16 How. 251; Market Co. v. Hoffman, 101 U. S. 115; Thornley v. U. S., 113 U. S. 313, 5 Sup. Ct. 491. And it is no more legitimate here to reject the word "conspiracy," or, what is practically the same thing, strip it of its well-settled criminal significance by confining it within forms of contract or of combinations in the form of trusts. For like reasons I am unable to regard the word "commerce," in this statute, as synonymous with "trade," as used in the common-law phrase "restraint of trade." In its general sense, trade comprehends every species of exchange or dealing, but its chief use is "to denote the barter or purchase and sale of goods, wares, and merchandise, either by wholesale or retail," and so it is used in the phrase mentioned. But "commerce" is a broader term. It is the word in that clause of the constitution by which power is conferred on congress "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." Const. U. S. art. 1, § 8. In a broader and more distinct exercise of that power than ever before asserted, congress passed the enactments of 1887 and 1888 known as the "Interstate Commerce Law." The present statute is another exercise of that constitutional power, and the word "commerce," as used in this statute, as it seems to me, need not and should not be given a meaning more restricted than it has in the constitution. That meaning has often been defined by the supreme court. Gibbons v. Ogden, 9 Wheat. 195, 197; Gilman v. Philadelphia, 3 Wall. 713; The Daniel Ball, 10 Wall. 557; The Case of the State Freight Tax, 15 Wall. 232, 275; Pensacola Tel. Co. v. W. U. Tel. Co., 96 U. S. 1; Ex parte Siebold, 100 U. S. 371, 395; County of Mobile v. Kimball, 102 U. S. 691; Wabash, etc., Ry. Co. v. Illinois, 118 U. S. 569, 7 Sup. Ct. 4; Cherokee Nation v. Southern Kansas Ry. Co., 135 U. S. 641, 657, 10 Sup. Ct. 965. I quote passages which will serve incidentally to dispose of a number of points raised in the course of the argument, without referring to them more directly:

"The power of congress," said Chief Justice Marshall, in Gibbons v. Ogden, in 1824, when railroads were unknown, "comprehends navigation within the limits of every state in the Union, so far as that navigation may be, in any manner, connected with 'commerce with foreign nations, or among the several states, or with the Indian tribes.' "

In Gilman v. Philadelphia it is said:

"The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States which are accessible from a state other than those in which they lie. For this purpose they are the public property of the nation, and subject to all the requisite legislation of congress. This necessarily includes the power to keep them open and free from any obstruction to their navigation, imposed by the states or otherwise. * * * It is for congress to determine when its full power shall be brought into activity, and as to the regulations and sanctions which shall be provided."

In the case of The Daniel Ball, a steamer employed on Grand river between Grand Rapids and Grand Haven, Mich., Justice Field, speaking for the court, said:

"So far as the steamer was employed in transporting goods destined for other states, or goods brought from without the limits of Michigan and destined to places within that state, she was engaged in commerce between the states; and, however limited that commerce may have been, she was, so far as it went, subject to the legislation of congress. She was employed as an instrument of that commerce; for, whenever a commodity has begun to move as an article of trade from one state to another, commerce in that commodity between the states has commenced. The fact that several different and independent agencies are employed in transporting the commodity, some acting entirely in one state, and some acting through two or more states, does in no respect affect the character of the transaction. To the extent in which each agency acts in that transportation, it is subject to the regulation of congress."

### In the State Freight Tax Case, Justice Strong said:

"Beyond all question, the transportation of freight or of the subjects of commerce, for the purpose of exchange or sale, is a constituent of commerce itself. This has never been doubted, and probably the transportation of articles of trade from one state to another was the prominent idea in the minds of the framers of the constitution when to congress was committed the power to regulate commerce among the several states. A power to prevent embarrassing restrictions by a state was the thing desired. The power was given by the same words, and in the same clause, by which was conferred power to regulate commerce with foreign nations. It would be absurd to suppose that the transmission of the subjects of trade from the state to the buyer, or from the place of production to the market, was not contemplated, for without that there could be no consummated trade either with foreign nations or among the states. In his work on the constitution (section 1057), Judge Story asserts that the sense in which the word 'commerce' is used in that instrument includes not only traffic, but intercourse and navigation; and in the Passenger Cases, 7 How. 416, it was said: 'Commerce consists in selling the superfluity; in purchasing articles of necessity, as well productions as manufactures; in buying from one nation and selling to another; or in transporting the merchandise from the seller to the buyer to gain the freight.' Nor does it make any difference whether this interchange of commodities is by land or by water. In either case, the bringing of the goods from the seller to the buyer is commerce."

### In Pensacola Tel. Co. v. W. U. Tel. Co., Mr. Chief Justice Waite, speaking for the court, after reciting the provisions of the constitution, says:

"The powers thus granted are not confined to the instrumentalities of commerce, or the postal service known or in use when the constitution was adopted, but they keep pace with the progress of the country, and adapt themselves to the new developments of time and circumstances. They extend from the horse with its rider to the stagecoach, from the sailing vessel to the steamboat, from the coach and the steamboat to the railroad, and from the railroad to the telegraph, as these new agencies are successively brought into use to meet the demands of increasing population and wealth. They were intended for the government of the business to which they relate, at all times and under all circumstances. As they were intrusted to the general government for the good of the nation, it is not only the right, but the duty, of congress to see to it that intercourse among the states and the transmission of intelligence are not obstructed or unnecessarily hindered by state legislation."

### In County of Mobile v. Kimball, in reference to the power of congress over the subject, it is said:

"That power is indeed without limitation. It authorizes congress to prescribe the conditions upon which commerce in all its forms shall be conducted between our citizens and the citizens or subjects of other countries, and between the citizens of the several states, and to adopt measures to promote its growth and insure its safety."

In Wabash, etc., Ry. Co. v. Illinois, Justice Miller, in the course of an exhaustive discussion, says:

"It cannot be too strongly insisted upon that the right of continued transportation from one end of the country to the other is essential in modern times to that freedom of commerce from the restraints which the state might choose to impose upon it, that the commerce clause was intended to secure. This clause, giving to congress the power to regulate commerce among the states and with foreign nations, as this court has said before, was among the most important of the subjects which prompted the formation of the constitution (Cook v. Pennsylvania, 97 U. S. 566, 574; Brown v. Maryland, 12 Wheat. 419, 446); and it would be a very feeble and almost useless provision, but poorly adapted to secure the entire freedom of commerce among the states which was deemed essential to a more perfect union by the framers of the constitution, if, at every stage of the transportation of goods and chattels through the country, the state within whose limits a part of this transportation must be done could impose regulations concerning the price, compensation, or taxation, or any other restrictive regulation interfering with and seriously embarrassing this commerce."

Speaking by the same judge, in Ex parte Siebold, the court had said:

"We hold it to be an incontrovertible principle that the government of the United States may, by means of physical force exercised through its official agents, execute on every foot of American soil the powers and functions that belong to it. This necessarily involves the power to command obedience to its laws, and hence the power to keep the peace to that extent. This power to enforce its laws and to exercise its functions in all places does not derogate from the power of the state to execute its laws at the same time and in the same places. The one does not exclude the other, except where both cannot be executed at the same time. In that case, the words of the constitution itself show which is to yield: "This constitution and all laws which shall be made in pursuance thereof * * * shall be the supreme law of the land.' * * * The government must execute its powers, or it is no government. It must execute them on the land as well as on the sea; on things as well as on persons."

In Cherokee Nation v. Southern Kan. Ry. Co., the court, speaking by Mr. Justice Harlan, says:

"Congress has power to regulate commerce, not only with foreign nations and among the several states, but with the Indian tribes. It is not necessary that an act of congress should express in words the purpose for which it was passed. The court will determine for itself whether the means employed by congress have any relation to the powers granted by the constitution. * * * The question is no longer an open one, whether a railroad is a public highway, established primarily for the convenience of the people, and to subserve public ends, and therefore subject to governmental control and regulation."

These definitions and expositions of the scope and law of interstate commerce, except the last, preceded the enactments by congress on the subject. It was therefore of commerce so defined, embracing all instrumentalities and subjects of transportation among the states, that congress, by that legislation, assumed the control; and I see no reason for thinking that as employed in the act of 1890, which is essentially supplemental of the other acts, the word was intended to be less comprehensive. It has been decided in a number of cases in the circuit courts, and in one instance by a circuit court of appeals, that this act cannot be applied to trusts or monopolies in the manufacture or production of articles of commerce. For instance, in Greene's Case, 52 Fed.

104, Justice Jackson held that congress had not the constitutional power, and by this act had not attempted, to limit the right of a corporation, created by a state, in the acquisition, control, and disposition of property in the several states, even if carried to the extent necessary for the control of traffic in a species of property among the several states. To the same effect was the ruling in U. S. v. Knight, which was affirmed by the United States circuit court of appeals for the Third circuit. 60 Fed. 306; Id., 60 Fed. 934, 9 C. C. A. 297. This case is pending on appeal in the supreme court.[1] See, also, Dueber Watch-Case Manuf'g Co. v. E. Howard Watch & Clock Co., 55 Fed. 851. If these decisions are right (a point upon which I express no opinion), it follows that the act in question has relation only to commodities, and possibly to persons, in the course of movement among the states, and to the agencies or means of transportation; and if, as is contended, and as seems to have been decided in U. S. v. Patterson, supra, it covers only contracts, combinations, or conspiracies "intended to engross or monopolize the market," it is an act of very narrow scope. Why should it not be construed to embrace all conspiracies which shall be contrived with intent, or of which the necessary or probable effect shall be, to restrain, hinder, interrupt, or destroy interstate commerce?

The argument to the contrary, drawn from the sixth section of the act, is not controlling, nor, as it seems to me, even strongly persuasive. That section provides for the forfeiture of "any property owned under any contract or by any combination, or pursuant to any conspiracy (and being the subject thereof) mentioned in this act, and being in the course of transportation from one state to another, or to a foreign country"; but it does not say nor imply that only cases, whether of contract or combination or conspiracy, in which property shall be found subject to forfeiture, shall be deemed to come within the scope of the act. The force of the section is the same, I think, as if it read: "If in any case there shall be found any property owned," etc., "it shall be forfeited," etc.; and so read it neither expresses nor implies any limitation of the provisions of other sections.

At this point is interposed the constitutional objection which, it is urged, forbids a construction that goes beyond trusts and monopolies to include conspiracies to employ force or violence in restraint of trade or commerce. The argument was employed and amplified in the Patterson Case, 55 Fed. 605, 629–632. It was contended there "that if two or more persons commit an act of murder, robbery, forgery, shop-breaking, store-burning, champerty, or maintenance, which in fact has a natural, though unintended, result of interference with interstate commerce, they are liable criminally for a conspiracy to interfere with interstate commerce, if the statute broadly covers conspiracy merely to interfere with it." This proposition is built on the assumption—which I believe is supported neither by authority nor reason—that co-conspirators are responsible as conspirators for the natural, though unintended, results of the commission or attempt by one of them to commit the particular offense

[1] Affirmed, 15 Sup. Ct. 249.

originally agreed upon or intended. It is a fundamental and essential principle of law, and of social order, that all engaged in the commission of a particular crime, whether as counselors, aiders, abettors, or otherwise, are individually responsible criminally for other offenses which result naturally from the commission or attempt to commit the crime intended; but, as agreement and intent are of the essence of a conspiracy, a conspiracy to commit a particular offense can hardly be deemed to include another conspiracy to commit another offense, unless the latter was the necessary result of the commission or attempt to commit the crime intended, or to such a degree the probable result that it could itself be charged in the indictment to have been intended. But if it were possible, by a course of technical reasoning and refinement, to extend the law of conspiracy to all crimes known to the law where two or more persons are implicated, it would, as Judge Putnam held, not involve the constitutionality of this act, which is limited to the field of interstate commerce, where the power of congress is unrestricted and supreme.

The question here, however, is of the validity of the fourth, rather than of the first, section of the act. It is urged that the power given by that section "to prevent and restrain violations" of the act is an unwarranted invasion of the right of trial by jury, and in support of the proposition are cited Puterbaugh v. Smith, 131 Ill. 199, 23 N. E. 428; Carleton v. Rugg, 149 Mass. 550–557, 22 N. E. 55; Littleton v. Fritz, 65 Iowa, 488, 22 N. W. 641; Eilenbecker v. Plymouth Co., 134 U. S. 31, 10 Sup. Ct. 424; Scott v. Neely, 140 U. S. 106, 11 Sup. Ct. 712; Pearson v. Yewdall, 95 U. S. 294; Boyd v. U. S., 116 U. S. 616–634, 6 Sup. Ct. 524; Counselman v. Hitchcock, 142 U. S. 547–582, 12 Sup. Ct. 195.

Little need be added to what has already been said upon that subject. The same act may be a crime and a contempt of court. If an assault or murder be committed in the presence of a court, the offender will be punishable both for the crime and for the contempt, and so with any other act committed in violation both of a criminal statute and of an injunction or order of court. Within the proper subjects of equitable cognizance, as established when the constitution was adopted, it was competent for congress to vest the courts with the jurisdiction granted by this section, and to impose upon them the duty of its exercise in proper cases. Just as, in construing the first section of the act, its general words are limited by force of the title to unlawful restraint, and the words "in restraint of trade," in their connection with the words "contract" and "combination," are to be given their common-law significance, so the jurisdiction in equity, though given in broad and general terms, will be deemed to be limited so as not to extend to a case which is not of equitable cognizance. Indeed, if the sixth section of the act may legitimately be used in aid of the construction of the first section, the fourth section warrants, if it does not require, that the first section be restricted to cases in which, in accordance with established precedent, an injunction could issue,—a limitation which would not be essentially uncertain or of difficult application,

and which, if necessary to the upholding of the statute, might well be adopted.

That this case is one of equitable character is clear, and, as I understand, has not been questioned by counsel; their contention being that neither by this statute, nor upon general principles, is the case within the jurisdiction of a federal court. Excepting the case of U. S. v. Patterson, I know of no ruling inconsistent with the jurisdiction here exercised. The case of U. S. v. Trans-Missouri Freight Ass'n, 53 Fed. 440; Id., 7 C. C. A. 15, 58 Fed. 58, had reference to a contract between railroads, which was alleged to have been made in violation of the act, but was held to be not unlawful. In the case of U. S. v. Workingmen's Amalgamated Council of New Orleans, 54 Fed. 994, the late Judge Billings, under this statute, granted an injunction upon facts which made the question of jurisdiction the same as it is here, and in respect to that question his ruling and opinion were distinctly approved by the circuit court of appeals for the Fifth circuit (6 C. C. A. 258, 57 Fed. 85). The court said:

"The appellants assign as error the overruling by the circuit court of each of the grounds of objection urged . in that court against the granting of said injunction. These are well summarized, discussed, and disposed of in the very able opinions of the judge of the circuit court who passed the decree now sought to be reversed. The matters of law presented to and considered by him were not well taken by the appellants (respondents below) and the circuit court's ruling to that effect was correct. The bill exhibited is clearly within the statute, and the pleadings of the respondents were not such as to require the refusal of the prayer for ·a temporary injunction."

See, also, the opinion of Judge Speer in Waterhouse v. Comer, 55 Fed. 149.

In the Case of Phelan, 62 Fed. 803, who was charged with contempt of the United States circuit court at Cincinnati, growing out of the strike of last summer, and involving facts essentially identical with the facts of this case, Judge Taft declared the combination to be "in the teeth of the act of July 2, 1890," and after quoting from the act, and referring to the rulings of other judges in accord with his own view, said:

"A different view has been taken by Judge Putnam in the case of U. S. v. Patterson, 55 Fed. 605; but, after consideration, Judge Lurton and I cannot concur with the reasoning of that learned judge. The fact that it was the purpose of Debs, Phelan, and their associates to paralyze the interstate commerce of this country is shown conclusively in this case. and is known of all men. Therefore, their combination was for an unlawful purpose, and is a conspiracy, within the statute cited."

In the recent case of U. S. v. Elliott, 64 Fed. 27, Judge Philips declares similar views.

The facts of this case suggest illustrations of the impropriety as well as inconsistency of putting upon the statute the restrictive construction proposed. If, for example, the manufacturers of other sleeping cars, in their own interest, should enlist the brakemen and switchmen or other employés of the railroads, either individually or in associated bodies, in a conspiracy to prevent or restrain. the use of Pullman sleepers, by refusing to move them, by secretly uncoupling, or by other elusive means, the monopolistic character of

the conspiracy would be so evident that, even on the theory that the statute is aimed at contracts or combinations intended to engross or monopolize the market, it would be agreed that the offense ought to be punishable.  But in such a case if the officers or agents of the car companies, who might or might not be capitalists, would be individually responsible for violating the statute, upon what principle could the brakeman or switchman be exempt?  Can workingmen, or, if you will, poor men, acting by themselves, upon their own motion and for their own purposes, whether avowed or secret, do things forbidden by the statute, without criminal responsibility, and yet be criminally responsible for the same things done at the instance and to promote the purposes of others?  Or will it be said that under this statute one who is not a capitalist may, without criminality, assist capitalists in the doing of things which on their part are criminal?  If that be so, then, if a capitalist and one who is not a capitalist join in doing things forbidden by this statute, neither can be punished, because one alone cannot be guilty of conspiracy.  The persistent effort of the defendants, as the proof shows, was to force the railroad companies—the largest capitalists of the country—to co-operate, or at least to acquiesce, in a scheme to stop the use of Pullman sleepers; and for a time they had the agreement of a manager and other officers of one road to quit the use of the obnoxious cars, and perhaps a qualified submission of the officers of another road or two to the same dictation:  Does the guilt or innocence of the defendants of the charge of conspiracy, under this statute, depend on the proof there may be of their success in drawing to the support of their design those who may be called capitalists, or does it depend upon the character of the design itself, and upon what has been done towards its accomplishment by themselves and by those in voluntary co-operation with them, from whatever employment or walk in life?

I have not failed, I think, to appreciate the just force of the argument to the contrary of my opinion,—it has sometimes entangled me in doubt,—but my conclusion is clear that, under the act of 1890, the court had jurisdiction of the case presented in the application, and that the injunction granted was not without authority of law, nor for any reason invalid.

This brings me to the question of fact:  Did the defendants violate the injunction?  The evidence upon the question is voluminous, but need not be reviewed in detail.  The injunction issued July 2d, and on the 3d and 4th was served upon the defendants Debs, Howard, Rogers, and Keliher.  It was not served upon the other defendants, and in one of the briefs it is contended that only parties to a bill can be charged with violating an injunction; that while strangers to a suit in chancery may be liable for willful interference, their cases stand upon the same footing as ordinary criminal contempts, and their answers are conclusive.  Authorities cited:  Watson v. Fuller, 9 How. Pr. 425;  Kip v. Deniston, 4 Johns. 24;  Boyd v. State, 19 Neb. 128, 26 N. W. 925;  Lord Elden's Opinion, 7 Ves. 257–259;  State v. Anderson, 5 Kan. 90, 114;  Elliott v. Osborne, 1 Cal. 396;  Jewett v. Bowman, 27 N. J. Eq. 171;

Coddington v. Webb, 4 Sandf. 639.  In another brief the weight of authority is conceded to be that one who has actual notice of an injunction is bound by it.  Rapalje, Contempt, 46; Ewing v. Johnson, 34 How. Pr. 202; Waffle v. Vanderheyden, 8 Paige, 45.  I know of no authority and perceive no reason for treating the answer of a stranger to the bill as conclusive, while the answer of a party to the bill is not conclusive.

The testimony of newspaper reporters shows that on July 4th Debs said to one of them:

"I have done nothing unlawful.  I have kept myself strictly within the provisions of Judge Caldwell's decision, * * * and I shan't change my course of conduct in any way by reason of the service of this injunction."

Again, on the 7th, that:

"There had been another injunction served upon him, and it should not make the slightest difference in the manner in which the American Railway Union was doing its business; it had kept within the bounds of the law."

To another, on July 2d, he had said, in substance—

"That he was not afraid of any court or grand jury, or of any injunction as he had done nothing to be enjoined against, and that the American Railway Union would continue the fight on the same lines they had commenced."

July 3d the defendant Burns, who, it should be observed, in responding jointly with his codefendants Hogan and others to interrogatories, had asserted that they were not informed of the injunction until near the end of the strike, in answer to the inquiry of the reporter what they should do about it, said:

"Why, they would simply laugh at the injunction; that the Railway Union knew its rights; that they had not done anything wrong,—had not interfered with interstate commerce or mails or passengers; that they had simply called off their men; that they had not done anything contrary to the injunction; that they had a right to strike peaceably."

These declarations are not brought forward for the purpose of showing that the defendants held or expressed sentiments of contempt for the order of the court.  Whether they did or not is immaterial here.  Their conduct only is in question, and these expressions are quoted because they confirm the inference deducible from other evidence, that no essential and voluntary modification of their course of action either followed or was caused by the injunction.  Their original intention, it is true, was only to prevent the use of Pullman cars, but finding, as they did, immediately, that that aim would be thwarted by the discharge from service of men who refused to handle those cars, they began as early as June 27th, the day after the boycott was proclaimed, to issue orders to strike; and from that time to the end, to the extent of their ability, they conducted and controlled the strike with persistent consistency of purpose, and with unchanged methods of action.  What they did the first day they did, in substance, each succeeding day, so that it is not necessary to discriminate very closely between what was done before and what after service of the injunction.

As officers of the American Railway Union, it is beyond question that the defendants had practical control of the strike, guiding as they chose the movements of the men actively engaged.  Is it

true, as they assert, that they did nothing, and advised or instigated nothing, unlawful, and nothing contrary to the injunction? Leaving out of view for the moment the rule that co-conspirators are responsible for the deeds of each other, done in furtherance of the common design, is it true that the defendants, in the exercise of their acknowledged leadership, did no more than advise a peaceable strike or withdrawal of their followers from railroad service, or did they counsel and encourage such violence and intimidation as they knew to be necessary to prevent the equipment and moving of trains? To the charge of the information that they knew "that violence invariably follows all strikes of a similar character," they answered by denying that "they knew that violence and unlawful conduct necessarily follows from strikes of the kind mentioned." When, at an early stage of the case, the court suggested that in the use of the word "necessarily" the answer was not responsive to the information, where the word "invariably" was employed, the variance was stated by counsel to have been inadvertent, and leave was taken to amend; but, instead of an amendment curing the defect, a supplemental answer was filed, which merely denies such averments and parts of the information as they had not "in their former answer expressly admitted or denied." On this point, Hogan and the other defendants to the second information speak more explicitly, denying "that they or either of them knew or could have known that any such acts were certain or almost certain, or probable or reasonably to be expected, to follow from such strikes or cessation of labor." While this is not perceived to be equivocal or evasive, it is difficult to understand how intelligent men familiar with the subject, as these men may be presumed to have been, could honestly affirm it. Strikes by railroad employés have not been infrequent of late years in this country, and the testimony of the one witness who spoke on the subject, and whose experience and intelligence made him apparently quite competent to speak, accord with what I suppose to be common knowledge,—that they have been attended generally, if not in every instance, with some form of intimidation or force. The witness said he knew of no exception. Under the conditions of last summer, when there were many idle men seeking employment, it was impossible that a strike which aimed at a general cessation of business upon the railroads of the country should succeed without violence; and it is not to be believed that the defendants entered upon the execution of their scheme without appreciating the fact, and without having determined how to deal with it. The inference therefore is a fair one, aside from direct evidence to the point, that they expected and intended that this strike should differ from others only in magnitude of design and boldness of execution, and that the accustomed accessories of intimidation and violence, so far at least as found essential to success, would not be omitted. For that much the striking workmen, acting on the promptings of self-interest, without instigation or direct suggestion, and even in spite of admonitions to the contrary, may ordinarily be counted on. Such admonitions against violence were

sent out occasionally by the defendants, but it does not appear that they were ever heeded; and I am not able to believe on the evidence that, in the fullest sense, it was expected or intended that they should be. I am able and quite ready to believe that the defendants not only did not favor, but deprecated, extreme violence, which might lead to the destruction of property or of human life. But they were not unwilling that coupling pins should be drawn; that Pullman cars should be "cut out" and side tracked; that switches should be turned and trains derailed; that cars should be overturned and tracks obstructed; that false or contradictory signals should be given to moving trains; that the strikers and lawless rioters should wear a common badge, and should assemble together upon the tracks and yards of the companies to obstruct business; that engineers and firemen should be pulled from their cabs, if by persuasion or threats they could not be induced to leave them; that the unemployed should be deterred by threats or abuse from taking the places of strikers; and that engines should be "plugged," or otherwise "killed." These things, and the like of them, were done daily in Chicago and elsewhere by members, and sometimes by officers, of the local unions, without protest or condemnation, and some of them at the instigation of the defendants, who, it can hardly be doubted, were well aware of what was going on. When, therefore, in his address of June 29th, "To the Railway Employés of America," Debs said: "I appeal to the strikers everywhere to refrain from any act of violence. Let there be no interference with the affairs of the companies involved, and, above all, let there be no act of depredation. A man who will destroy property or violate law is an enemy, and not a friend, to the cause of labor. The great public is with us," etc.,—the chief aim, I am convinced, was to secure the good will of the public. To that end the warnings against acts of depredation or visible destruction of property, it may well be believed, were sincere; but their followers did not understand, and the court cannot believe, that it was intended to forbid intimidation and the milder forms of violence, which did not directly involve the destruction of property or severe injury to person, and which for that reason, it seems, were assumed to be not unlawful, when employed in the interests of organized labor in a contest with "an alliance of rich and powerful corporations." By just what theories of law and duty they were governed might be better understood, perhaps, if in that part of the answer which alleges "that upon the service of the injunction the defendants consulted competent counsel, learned in the law, and, upon a full and fair statement of the facts in the premises, they were advised what they might rightfully and lawfully do without violating the order of the court, and that since that time they have in all things proceeded in accordance with that advice," they had disclosed, as they ought to have done, just what statement of the facts they made to counsel, and what advice they received. Without such disclosure, either in the answer or the proof, the alleged advice neither justifies nor mitigates a wrong or error committed in pursuance of the advice, but raises, rather, a presumption that a full

statement would not be advantageous. Proof was made of portions of the testimony of Mr. Debs on the 20th of August before the commission appointed by the president, wherein, among other things, he said:

"It is understood that a strike is war; not necessarily a war of blood and bullets, but a war in the sense that it is a conflict between two contending interests or classes of interests. There is more or less strategy, too, in war, and this was necessary in our operation. Orders were issued from here, questions were answered, and our men were kept in line from here. * * * As soon as the employés found that we were arrested, and taken from the scene of action, they became demoralized, and that ended the strike. It was not the soldiers that ended the strike. It was not the old brotherhoods that ended the strike. It was simply the United States courts that ended the strike. Our men were in a position that never would have been shaken, under any circumstances, if we had been permitted to remain upon the field, among them. Once we were taken from the scene of action, and restrained from sending telegrams or issuing orders or answering questions, then the minions of the corporations would be put to work. * * * Our headquarters were temporarily demoralized and abandoned, and we could not answer any messages. The men went back to work, and the ranks were broken, and the strike was broken up, * * * not by the army, and not by any other power, but simply and solely by the action of the United States court in restraining us from discharging our duties as officers and representatives of our employés.

In answer to an inquiry what, if anything, he did to ascertain whether his men were concerned in violence, he said:

"We did that [by] our committee, which called at headquarters every evening and advised us. They were instructed to guard the company's property, if they were near it at all, and to apprehend anyone that might be caught destroying property. This instruction was given again and again to the central committee that went out from headquarters. We said we knew that if there was trouble, if there was disorder and riot, we would lose, because we knew enough by experience in the past that we had everything to lose by riot, and nothing to gain. We said that man who incites riot or disorder is our enemy, and we have got to be the first to apprehend and bring him to justice. So we called upon our men, and advised them, urged them, to do everything in their power to maintain order, because we felt and knew that if there was perfect order there was no pretext upon which they could call out the soldiers, or appeal for the intervention of the court, and we would win without a question of a doubt."

One or two reflections upon these statements will be enough: First, with all that is said about guarding property, keeping the peace, and being the first to arrest offenders, not one was arrested, and no effort was made by strikers or members of the Railway Union to preserve the peace or to protect property. On the contrary, many of them were leaders in scenes of violence and disorder. Second, if this strike, like others, was understood to be war, not necessarily of blood and bullets, but a conflict between contending interests or classes of interests, in which strategy had to be employed to keep the men in line, it was more than a peaceable strike, or mere cessation from work. Had it been only that, the injunction, instead of being a hindrance, would have been in their hands the very weapon they needed to enable them to suppress the violence and disorder in which alone, they say, they saw possible danger to the success of their cause.

"When the trouble began," said Mr. Debs again, in his testimony before the commission, "there were thousands of telegrams and communi-

cations pouring in, and it was impossible for me to see them all personally, because I was out among the men, meeting with committees, meeting at different cities, and addressing meetings, and all that kind of work; so it was really impossible for all those telegrams that were coming in to come under my personal notice. So then the work was apportioned by the board to its members. This young man named Benedict (who had been employed as an assistant secretary) answered, by instruction of the board, some telegrams, and in other cases, where the board was all absent, he answered telegrams himself. Telegrams, when he had answered others of a kindred character, he would answer without instructions." The inconsistency of these statements with the averments of the answer of the defendants to the original information, denying responsibility for the telegrams sent and received, is too evident to need comment, but they are quoted here not so much to point out the discrepancy as to show the activity of Mr. Debs, his intimate connection with the conduct of the strike, and consequently his direct responsibility for what was done. By his admission, he was out among the men, meeting committees, and addressing meetings. It is shown also by the testimony of two or more witnesses that on the night of June 29th he and Howard and Keliher attended a meeting of the local union at Blue Island, a suburb of Chicago, on the line of the Rock Island & Pacific Railroad; that he and Howard each addressed the men, urging them to join the strike; that, among other things, one or both of them said the men "ought to stand together and go out in a body"; that if others came to take their places "they ought to make them walk the plank." In the language of the witnesses, "They told the workmen there that the only way to resist the orders of the general managers in cutting down the wages of the men in detail on the different roads was by unanimously organizing and standing by, —all standing together. Debs told them not to molest the mail trains, but," as the witness puts it, "not to let the Pullman cars out, at no hazards." Howard "advised the men not to do any violence, or anything like that, but to go out, and stay out, man to man, and they would win the victory." "Howard said not to commit any violence, but not to allow any Pullman cars to run, at no hazard." "He said all those that didn't go out and stay out, and help the laboring class of people out of trouble, will have to walk the plank in the future." These speeches did not mean, and were not understood by the men to whom they were addressed to mean, that no resistance should be made by them to the running of Pullman cars, or that they should submit unresistingly to the employment of other men to take their places. They voted that night to join the strike, and on the next day inaugurated "a condition of turbulence" which a witness declared he "did not believe could exist." "A body of men, principally ex-employés of the Rock Island road, blockaded traffic, threatened violence, and tied up the road." "The same condition, only worse, July 1st," and notwithstanding the efforts of the United States marshal, by reading the injunction and otherwise, to quell the disturbance, nothing was ac-

complished until the 5th of July, when federal soldiers arrived. With that assistance, through trains began to be moved, and the transportation of the mails was resumed on the 7th or 8th, but it was not until the 14th that traffic on that line was fully restored. These things directly followed, and in large measure, I think it not unwarranted to say, were the natural and probable result of, the speeches made and counsel given to the men by Debs and Howard at the meeting on the night of the 29th at Blue Island. Similar suggestions, calculated to incite to acts of violence or intimidation, were contained in many of the telegrams which were sent out over the name of Debs, and for which, notwithstanding the averment of their sworn answers to the contrary, it is no longer possible for any of the defendants to evade some measure of responsibility. I quote from a few of them, commencing June 27th:

"A boycott has been declared against the Pullman Company, and no Pullman cars are to be handled." "If men are discharged for refusing to handle Pullman cars, every employé should at once leave the service of the company."

### June 28th:

"No forcible interference with mail trains, but any man who handles trains or cars will be a scab." "No loyal man will handle any train at all on your system." "Tie up every line possible, to enforce boycott. Do not cut any cars from mail trains, but no loyal man will move a train of any kind under existing conditions." "Passenger train came south this morning, and will be held here." (To Debs from Las Vegas.) "If your company refuses to boycott Pullman, tie it up."

### June 29th:

In substance: Leave denied for train at Livingston, Montana, to proceed with sick passengers. "All taking part in this struggle will receive protection of A. R. U., whether members or not." "Pay no attention to injunction orders. Men will not be slaves."

### June 30th:

"This is a fight against combined capital and oppression, and we are assured winners. Do no violence, but every man stand pat and firm." "No fear about reinstatement. All lines in Chicago are paralyzed. Impossible to get scabs to fill places in time." "Do not interfere with mail trains in any manner."

### July 1st:

"Knock it to them as hard as possible." "Have men stand firm. They show a better front in Ohio than you. * * * I do not suspect Grand Junction of housing scabs or sucklings of autocrats."

### July 2d:

"The train will haul your car to its destination on presentation of this telegram." (To Mrs. Leland Stanford.) "All who work during present strike will be branded as scabs."

### July 3d:

"This is authority to call out roads named." "Tie up Big Four." "Get your men out immediately." "It will take more than injunctions to move trains. Get everybody out." "Wear a white ribbon, instead of red. We have requested our friends to wear white in Chicago." "Let everybody wear white ribbon who are in favor, and all opposed wear red." "Do not let court order scare you. I have had orders served on me. We are breaking no laws. You and all strikers have quit your places peaceably, as is your right. * * * Don't be silly."

July 4th:

"Have your men stand pat. They will have to make many arrests before this strike is over. We all stand firm. Arresting men will not operate the road." "To call out troops was an old method of intimidation. Commit no violence. Have every man stand pat. Troops cannot move trains. Not scabs in the world to fill places, and more occurring hourly." "This is authority to call out P. D. & E."

July 5th:

"The lines are now sharply drawn. Capital has declared war. Any man who works is assisting capital to defeat labor." (Richards of St. Paul to Debs): "Send all good news possible. * * * Look after locals on all roads, and play the strongest card left."

July 8th:

"You cannot paralyze the world in a minute. Do not let strong men become childish. * * * You appear to be paying more attention to newspapers than to messages."

July 10th:

"Debs, Howard, Keliher, Rogers, in jail. Rest expect to go. This is the last act of the corporations. Our cause is just. Victory certain. Stand pat. [Signed] Hogan."

July 14th:

"All negotiations off. Stand to a finish now."

The condition as it was on the 12th of July is aptly described in the letter of that date signed by Debs, Howard, and Keliher, as officers of the American Railway Union, and addressed, "To the Railway Managers." It is set out in full as a part of the information,[1] and if more convincing evidence of the nature of the strike, and of the direct personal and official responsibility of the defendants for what was done, and for the results, were needed, it is found in that document.

But the defendants are not entitled to be judged solely by the rules which determine the responsibility of one who has acted without combination or agreement with another. The bill upon which the injunction was ordered charged them with conspiracy, as, under the statute, it must have done, in order to bring them within the cognizance of the court. Conforming to the allegations of the bill, the injunction, in substance, commanded them, and all combining or conspiring with them, "to desist and refrain" from interfering with the business, rolling stock, and other property of the roads named; from using force, threats, or persuasion to induce employés of the roads to neglect duty; from using force or threats to induce employés to quit, or other persons not to enter, the service of the roads; from doing any act in furtherance of a conspiracy to interfere with interstate commerce on the roads; and from ordering, aiding, or abetting any person to do the forbidden things. It is not necessary to consider whether this injunction, when properly construed, forbids, or whether it might lawfully have been made to forbid, the employés of the railroad companies to quit work in furtherance of the alleged conspiracy, or to forbid others, in aid of the conspiracy, to persuade or advise them to quit. The order was not intended when issued,

---

[1] Ante, p. 729.

and will not now be construed, to go so far. In the recent case of Arthur v. Oakes (C. C. A., 7th Circuit), 63 Fed. 310, it was decided, with my full concurrence in the opinion, that a court of equity will not, "under any circumstances, by injunction, prevent one individual from quitting the personal service of another"; and in respect to the right of employés, singly or in concert, to quit work, and of others to advise them on the subject, there is no present necessity for adding to what was said in that case, further than to observe that neither expressly nor by implication does the opinion there delivered lend the remotest sanction to the proposition asserted by one of the counsel for the defendants, that in free America every man has a right to abandon his position, for a good or a bad reason, and that another, for good or bad reason, may advise or persuade him to do so. Manifestly that is not true. If it were, a servant might quit his place, and another might advise him to quit, in order to make way for the entry of thieves or burglars into the employer's house,—a suggestion at which simple minds revolt, and for which the acutest can invent neither justification nor apology. The rule is familiar in criminal jurisprudence that any act, however innocent in itself, becomes wrongful or criminal when done in furtherance of an unlawful design. But whether or not, in a particular case, an injunction will be appropriate, and to what extent it shall go if granted, will depend on other considerations than the mere wrongfulness or illegality of the act or conduct proposed to be enjoined. The right of men to strike peaceably, and the right to advise a peaceable strike, which the law does not presume to be impossible, is not questioned. But if men enter into a conspiracy to do an unlawful thing, and, in order to accomplish their purpose, advise workmen to go upon a strike, knowing that violence and wrong will be the probable outcome, neither in law nor in morals can they escape responsibility.

The evidence establishes, and it has not been denied, that on the 21st day of June, 1894, the American Railway Union, in convention at Chicago, declared a boycott against the Pullman palace cars, to take effect after five days if meanwhile the Pullman Company should not accede to a proposed arbitration with striking workmen; that the convention, after conferring upon the directors of the union jurisdiction over all matters connected with the boycott, adjourned on the 25th of June; that on the next day the following notice or order was issued, over the signature of the president of the union: "June 26, 1894, 1:30 p. m. Boycott against Pullman cars in effect at noon to-day. By order of convention. E. V. Debs,"—and that on the same day the following telegram was sent to the general officers of labor organizations throughout the country:

"A boycott against the Pullman Company, to take effect at noon to-day, has been declared by the American Railway Union. We earnestly request your aid and co-operation in the fight of organized labor against a powerful and oppressive monopoly. Please advise if you can meet with us in conference, and, if not, if you will authorize some one to represent you in this matter. Address 121 Ashland Block. Eugene V. Debs, President."

Pullman cars in use upon the roads are instrumentalities of commerce, and it follows that from the time of this announcement, if not

from the adoption of the resolution by the convention, the American Railway Union was committed to a conspiracy in restraint of inter-state commerce, in violation of the act of July 2, 1890, and that the members of that association, and all others who joined in the movement, became criminally responsible each for the acts of others done in furtherance of the common purpose, whether intended by him or not. The officers became responsible for the men, and the men for the officers. While I do not accede to the proposition which was advanced in Patterson's Case, for the purpose of invalidating or of putting a narrow construction upon the statute, that a conspiracy to commit a specified offense includes a conspiracy to commit any other offense which may result and does result from an attempt to commit the offense intended, the rule is well settled, and I suppose well understood, that all who engage, either as principals or as advisers, aiders, or abettors, in the commission of an unlawful or criminal act, are individually responsible for the criminal or injurious results which follow the commission or an attempt by any of their number to commit the intended crime or wrong. It is by the same rule that co-conspirators are responsible for the acts and declarations of each other in the furtherance of their unlawful purpose. Brennan v. People, 15 Ill. 511; Hanna v. People, 86 Ill. 243; Lamb v. People, 96 Ill. 74; Whart. Cr. Law, § 1405; 1 Bish. Cr. Law, 636; Hawk. P. C. c. 29, § 8. I quote:

"Upon this ground [says Hawkins, supra], it has been adjudged that where persons combine together to stand by one another in the breach of the peace, with a general resolution to resist all opposers, and in the execution of their design a murder is committed, all the company are equally principals, though at the time of the fact some of them were at such a distance as to be out of view."

"A man may be guilty of a wrong which he did not specifically intend [says Bishop], if it came naturally, or even accidentally, through some other specific, or a general, evil purpose. When, therefore, persons combine to do an unlawful thing, if the act of one, proceeding and growing out of the common plan, terminates in a criminal result, though not the particular result meant, all are liable."

In State v. McCahill (Iowa) 30 N. W. 553, the court said:

"Where there is a conspiracy to accomplish an unlawful purpose, and the means are not specifically agreed upon or understood, each conspirator becomes responsible for the means used by any co-conspirator in the accomplishment of the purpose in which they are all at the time engaged."

These defendants were the directors and general officers of the American Railway Union, and had practical control of the organization. They procured the adoption of the resolutions by which the boycott of the Pullman cars was declared, and authority given themselves to begin and control the movement. They put themselves at once in telegraphic communication with the officers of local unions, advising them of the action of the convention, and that no Pullman cars were to be handled; but, it appearing very soon that men who refused to handle Pullman cars were being discharged, they determined to prevent the running of all trains upon all the roads until the companies should accede to their demands, including the reinstatement of men who had been discharged. Later the Pullman strikers were abandoned, and only the re-employment of

railroad men insisted on. As early as the 27th of June they sent out telegrams directing men to quit work if the running of Pullman cars was insisted upon, and unless discharged men were restored to their places, and by the 28th it had become the distinct policy "to get the men out"; "to tie up" or paralyze the roads; to promise full protection to all who joined in the strike; to denounce as scabs, or as traitors to the cause of labor, all who refused to go out, and all who should consent to take places which others had abandoned,— and later the form or substance of expression became: "All employés of all roads will stand together"; "None will return until all return." By this course the original conspiracy against the use of Pullman cars became a conspiracy against transportation and travel by railroad. Upon their own authority, without consulting the local unions, the defendants converted the boycott into a strike; and with the aid of followers, some of whom stopped at no means between the drawing of a coupling pin and the undermining of a bridge, whereby men should be hurled to death, they pushed the strike to the conditions which prevailed when the intervention of the court was asked, and which, in the end, compelled the employment of military force to re-establish peace and start again the activities of commerce. The evidence leaves no feature of the case in doubt. The substance of it, briefly stated, is that the defendants, in combination with the members of the American Railway Union and others, who were prevailed upon to co-operate, were engaged in a conspiracy in restraint or hindrance of interstate commerce over the railroads entering Chicago, and, in furtherance of their design, those actively engaged in the strike were using threats, violence, and other unlawful means of interference with the operations of the roads; that by the injunction they were commanded to desist, but instead of respecting the order, they persisted in their purpose, without essential change of conduct, until compelled to yield to superior force.

Much has been said, but without proof, of the wrongs of the workmen at Pullman, of an alliance between the Pullman Company and the railway managers to depress wages, and generally of corporate oppression and arrogance. But it is evident that these things, whatever the facts might have been proved or imagined to be, could furnish neither justification nor palliation for giving up a city to disorder, and for paralyzing the industries and commerce of the country.

My conclusion in the case on the information of the United States implies a like conclusion in the other case, tried at the same time and upon the same evidence, wherein, by an information presented by the receivers of the Santa Fé Railroad, the defendants were charged with wrongful and violent interference with the operation of that road pending the strike. That they did interfere as alleged, is established by the evidence already considered. Though violation of the injunction of July 2d is alleged in the bill, the questions of jurisdiction and of the construction and application of the act of 1890 are not essentially involved, because, the property being in the custody of the court, any improper interference with its manage-

ment, it is well settled, constituted a contempt of the court's authority, as exercised in making the order appointing the receivers and enjoining interference with their control. The decision, or rather letter, of Judge Caldwell has been referred to, but, while that recognized the right of employés to quit the service of the receivers, it contained no warrant for intimidating or abusing those who were willing to take employment, or for otherwise interfering directly, as the defendants and their followers did, with the management and operation of the road. The court therefore finds the defendants (except McVean, whose case is held under advisement) guilty of contempt as charged in each of the cases. The same sentences will be ordered in both cases, but it is not intended that they shall be cumulative.